**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHICAGO TRIBUNE COMPANY, LLC,

        Plaintiff,

    v.

PERPLEXITY AI, INC.,

        Defendant.

Civil Action No. 1:25-cv-10094-LAP-GWG

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Chicago Tribune Company, LLC, (the "Chicago Tribune"), by and through its attorneys, Rothwell, Figg, Ernst & Manbeck, P.C., respectfully brings this complaint against Defendant Perplexity AI, Inc. ("Perplexity" or "Defendant").

**NATURE OF THE ACTION**

1. From Abraham Lincoln's presidency, to faulty regulations of children's products, to the human toll of gun violence, the Chicago Tribune has accurately and objectively reported on the most pressing issues of yesterday and today. Over the last 178 years, and as reflected by its 28 Pulitzer Prizes, the Chicago Tribune has earned a reputation for excellence. Its longevity and reputation were built through an investment and commitment to journalism. At a time when unbiased, local reporting has never been more important, and more under threat, Perplexity endangers the Chicago Tribune's future by unlawfully profiting off the trust the Chicago Tribune earned over time. Like other similar lawsuits against Perplexity, the instant action seeks to hold Perplexity responsible for its wrongdoing.

1

2.      Perplexity is a generative artificial intelligence ("GenAI") company that describes its namesake chatbot as an "answer engine."[1] According to Perplexity, "[w]hen you ask Perplexity a question, it uses advanced AI to search the internet in real-time, gathering insights from top-tier sources. It then distills this information into a clear, concise summary, delivering exactly what you need in an easy-to-understand, conversational tone."[2] Perplexity explains that once it "interpret[s] your question," it then "searches the internet, gathering information from authoritative sources like articles, websites, and journals."[3] What Perplexity characterizes as "gathering" involves copying publishers' content and combining it with a Large Language Model ("LLM") to produce lengthy and expressive output derived from copyrighted content that is owned by others. By doing this work, Perplexity purports to save users' time and energy and eliminate the need for its users themselves to visit the websites from which Perplexity derives its "answers."[4]

3.      In describing "what sets Perplexity apart," Perplexity touts that while "[t]raditional search engines present you with lots of links to sift through[,] Perplexity functions as an intelligent research assistant, streamlining your information gathering by delivering the precise knowledge you need without the extra steps and clicks."[5] To bypass the "extra steps and clicks," upon information and belief, Perplexity accesses as much content as it can from the Chicago Tribune and other sources of trusted, original, and reliable information. Indeed, as recently as August 2024, Perplexity boasted that its "answer engine" allowed users to "Skip the links" by providing "a

---

[1] Perplexity, *Getting Started*, https://www.perplexity.ai/hub/getting-started (last visited Dec. 4, 2025).

[2] Perplexity, *How does Perplexity work?*, https://www.perplexity.ai/help-center/en/articles/10352895-how-does-perplexity-work (last visited Dec. 4, 2025).

[3] *Id.*

[4] Perplexity Team, *Getting Started with Perplexity*, Perplexity (Oct. 1, 2024) https://www.perplexity.ai/hub/blog/getting-started-with-perplexity.

[5] Perplexity, *What is Perplexity*, https://www.perplexity.ai/help-center/en/articles/10352155-what-is-perplexity (last visited Dec. 4, 2025).

single, comprehensive answer that summarizes everything you need to know." *See Dow Jones & Co., Inc. & NYP Holdings, Inc. v. Perplexity AI, Inc.*, No. 1:24-cv-07984-KPF, at Dkt. 46 n.1 (S.D.N.Y. Jan. 28, 2025). Although Perplexity appears to have removed the "Skip the links" catchphrase from its promotional material, this core practice remains.

4.      Perplexity then makes copies of that content to store in its "AI-First" search index and to feed to its suite of retrieval-augmented generation or "RAG" products, including its consumer chatbot, referred to by Perplexity as its "answer engine";[6] enterprise chatbot;[7] application programming interfaces ("APIs");[8] and personal assistants (e.g., the Comet browser)[9] (collectively, "Perplexity's GenAI Products"). Perplexity then repackages the original content in written responses to users. Those responses, or outputs, often are verbatim or near-verbatim reproductions, summaries, or abridgements of the original content, including the Chicago Tribune's copyrighted works.

5.      Although Perplexity has a free standard tier, it offers paid plans, including Perplexity Pro, Enterprise Pro, and Enterprise Max. These paid plans offer, *inter alia*, "deeper sourcing from Perplexity's index," "search across the web, team files, and work apps," "2x file uploads," and "deep research at any scale."[10]

6.      Perplexity's conduct violates the Chicago Tribune's exclusive rights under the Copyright Act at two principal stages: First, at the input stage, Perplexity unlawfully crawls,

---

[6] Perplexity, *Answer Engine*, https://www.perplexity.ai/ (last visited Dec. 4, 2025).

[7] Perplexity, *Enterprise*, https://www.perplexity.ai/enterprise (last visited Dec. 4, 2025).

[8] Perplexity, *API Platform*, https://www.perplexity.ai/api-platform (last visited Dec. 4, 2025); Perplexity Research, *Architecting and Evaluating an AI-First Search API* (Sept. 25, 2025), https://research.perplexity.ai/articles/architecting-and-evaluating-an-ai-first-search-api.

[9] Perplexity, *Comet*, https://www.perplexity.ai/comet (last visited Dec. 4, 2025).

[10] Perplexity, *Enterprise Pricing*, https://www.perplexity.ai/enterprise/pricing (last visited Mar. 15, 2026).

scrapes, copies, and distributes the Chicago Tribune's content from its website and third-party platforms using software programs, including "PerplexityBot" and "Perplexity-User," to build an AI-First search index and to provide the Chicago Tribune's content in real time as input to LLMs to formulate a response to users' prompts. And second, at the output stage, when Perplexity's GenAI Products generate outputs that are identical or substantially similar to the Chicago Tribune's content. Upon information and belief, Perplexity has unlawfully copied millions of copyrighted Chicago Tribune stories, videos, images, and other works to power its products and tools.

7. In addition to its massive copyright infringement, Perplexity also violates the Chicago Tribune's trademark under the Lanham Act when its GenAI Products generate fabricated content or "hallucinations" and falsely attribute them to the Chicago Tribune by displaying them alongside its famous, registered trademark. Perplexity likewise violates the Chicago Tribune's trademark under the Lanham Act when its GenAI Products misleadingly omit portions of the Chicago Tribune's content without disclosing those omissions and display the incomplete and inaccurate reproductions alongside the Chicago Tribune's famous trademark. In addition, Perplexity's use of the Chicago Tribune's trademark constitutes false designations of origin and confuses and deceives Perplexity users into believing that the hallucinations and/or undisclosed omissions are associated with, sponsored by, or approved by the Chicago Tribune.

**THE PARTIES**

8. Plaintiff Chicago Tribune Company, LLC (the "Chicago Tribune") is a Delaware limited liability company with a principal place of business located in Illinois. The Chicago Tribune publishes digital and print products, including its core news product, *Chicago Tribune*, which is available on its mobile application, on its website (www.chicagotribune.com), and as a

printed newspaper. The Chicago Tribune owns registered copyrights for millions of its articles, including the registrations set forth in Exhibit A ("Chicago Tribune Works").

9. Defendant Perplexity AI, Inc. ("Perplexity") is a Delaware corporation with its principal place of business at 115 Sansome Street, Suite 900, San Francisco, California 94104.

JURISDICTION AND VENUE

10. This civil action seeks damages, injunctive relief, and other equitable relief under the Copyright Act of 1976, 17 U.S.C. § 101 et seq., and the Lanham Act, 15 U.S.C. § 1051 et seq.

11. This Court has subject matter jurisdiction over this civil action under 28 U.S.C. §§ 1331 and 1338.

12. As set forth in this section and further supported in the "Factual Allegations" below, this Court has personal jurisdiction over Perplexity pursuant to New York Civil Practice Law and Rules § 302(a)(1)–(4) and the Due Process Clause of the U.S. Constitution. In multiple independently sufficient ways, Perplexity has purposely availed itself of the privilege of doing business in the State of New York and subjected itself to New York's long-arm jurisdiction.

13. Since April 21, 2023, Perplexity has been registered to do business in the State of New York. Perplexity's New York Department of State identification number is 6837808.

14. Perplexity uses real property situated within this State and District, including office space in Manhattan, which is utilized for the conduct of its business as outlined in this Complaint. Perplexity states on its website, "You'll find our teams collaborating in offices across Palo Alto, New York," among other locations, and "our in-person team members spend 4 days a week in the office . . .."[11]  On or about February 18, 2025, Perplexity's Work Experience Manager, Tram Anh Phun, submitted a declaration in the Dow Jones litigation confirming that "Perplexity rents office

---

[11] Perplexity, *Help us build the future of discovery*, https://www.perplexity.ai/hub/careers (last visited Dec. 4, 2025).

space from Industrious, a co-working facility, located at 215 Park Avenue South, 11th Floor, New York, New York 10003." *See Dow Jones*, at Dkt. 49, at 8 (S.D.N.Y. Feb. 18, 2025). As further described below, this Court recently found Perplexity's office space in New York, in addition to other factors, to weigh in favor of exercising jurisdiction over Perplexity. *See id.*, at Dkt. 65, 2025 WL 2416401 (S.D.N.Y. Aug. 21, 2025).

15.    Perplexity's co-founder and Chief Strategy Officer Johnny Ho publicly described how since its founding, the company benefitted from its presence in New York. In response to a question about whether "there was something that gave you conviction about these individuals to go on the journey [to found Perplexity] with," Ho stated that his "being in New York brought some different perspectives to the company and allowed us to actually work in an a-sync way where all of us have our own ideas and push them together and find something that will align, hopefully not only with a bubble but, like, the entire world."[12]

16.    In another interview, Ho further revealed how the only in-person meeting among Perplexity's three co-founders when starting the company took place in New York: "We got together, like, one time in New York, and we had a whiteboard, and we spent like maybe two or three days together. And that was, like, pretty much the only time that we had in person. Everything else was just like remote."[13]

17.    Perplexity actively seeks to expand its presence in New York and take advantage of talent in this State and District. Perplexity's career webpage prominently features that it has

---

[12] The Room Podcast, *Empowering The Future of Gen AI with Johnny Ho, Co-Founder of Perplexity | The Room Podcast S11E1* (Oct. 1, 2024), at 10:02-10:45, https://www.youtube.com/watch?v=ZWtcsjQ1gQ4.

[13] Imagination in Action, *Inside Perplexity AI: A Conversation with Johnny Ho, Cofounder of Perplexity and CSO IIA @ MIT 2025* (Apr. 30, 2025), at 2:55-3:15, https://www.youtube.com/watch?v=4ibfXV5vYaA.

6

offices in San Francisco and New York City, among other cities. On November 10, 2025, the website listed at least six positions based in New York:

- AI Engineer, Applied ML
- Software Engineer - Agent Infra
- IT Systems Administrator
- Forward-Deployed Engineer – API Platform
- Senior/Staff Engineer – Reliability (SRE)
- Staff/Senior Software Engineer – Infrastructure

Moreover, positions advertised in other cities could still be staffed out of New York.

18.     Perplexity also targets customers in or visiting New York with material tailored specifically to New York. Its webpage https://www.perplexity.ai/encyclopedia/discovernewyork, invites visitors to "Discover New York with Perplexity."



19.     Perplexity also promotes itself in New York City. For example, in September 2024, Perplexity posted on Instagram a photograph of a billboard in Times Square which read

"Congratulations Perplexity on 250 million questions answered last month."[14] Below is a screenshot of the Instagram post.



20.    Similarly, on January 5, 2024, Perplexity's CEO Aravind Srinivas posted on X a picture of a Tesla Cybertruck emblazoned with Perplexity's name parked in Times Square. Below is a screenshot of the X post.[15]

---

[14] Perplexity [@perplexity.ai], Instagram (Sept. 4, 2024), https://www.instagram.com/perplexity.ai/p/C_g2TonSHC5.

[15]    Aravind    Srinivas    [@AravSrinivas],    X    (Jan.    6,    2025,    10:41    PM), https://x.com/aravsrinivas/status/1876474243921432832?s=46.



21.     Upon information and belief, Perplexity derives substantial revenue from services rendered in this State and District and from interstate commerce. As of November 2025, Perplexity has approximately 22 million active users across its website and app.[16] Upon information and belief, a significant number of these users are in this State and District. Moreover, upon information and belief, and as evidenced by its business operations in this State and District, Perplexity expects or should reasonably expect its business operations, including its actions alleged to be legal violations in this Complaint, to have consequences in the State and District. Indeed, Perplexity is already a party in at least three lawsuits in this District.[17]

22.     The Chicago Tribune's claims in this Complaint relate to Perplexity's business in this State and District and to the work of its employees in this State and District who create, design, market, and grow Perplexity's products and services. As alleged further in this Complaint, to eliminate "extra steps and clicks," Perplexity infringed on copyrighted works by making unauthorized copies and providing verbatim or substantially similar copies of these copyrighted works in its "answer engine." Moreover, when providing answers to subscribers and users in this

---

[16] David Curry, *Perplexity Revenue and Usage Statistics* (2025), Business of Apps (Nov. 10, 2025), https://www.businessofapps.com/data/perplexity-ai-statistics/.

[17] *See Reddit, Inc. v. SerpApi LLC et al.*, No. 25-cv-8736; *Encyclopaedia Britannica, Inc. et al. v. Perplexity AI, Inc.*, No. 25-cv-07546-JLR; *Dow Jones*, No. 24-cv-7984-KPF.

State and District, Perplexity will produce fabricated content or "hallucinations" and/or copied content with misleading omissions that devalue the Chicago Tribune's valuable trademark.

23.    This Court is also the appropriate forum for this action. Perplexity is already defending lawsuits filed against it in this state and district. In September 2025, Encyclopaedia Britannica, Inc. and Merriam-Webster, Inc. filed a complaint against Perplexity alleging copyright and trademark infringement. *See Encyclopaedia Britannica, Inc.*, No. 25-cv-07546-JLR (S.D.N.Y. Sept. 10, 2025). In January 2025, Dow Jones & Company and NYP Holdings filed in this District their second amended complaint against Perplexity alleging the same. *See Dow Jones*, at Dkt. 46 (S.D.N.Y. Jan. 28, 2025). On August 21, 2025, the *Dow Jones* court denied in full Perplexity's 12(b)(2), 12(b)(3), and 12(b)(6) motion to dismiss the complaint for lack of jurisdiction, improper venue, and failure to state a claim. *Id.*, at Dkt. 65, 2025 WL 2416401, at *1 (S.D.N.Y. Aug. 21, 2025). The Court further declined to transfer the case to the Northern District of California. *Id.* In reaching these conclusions, the Court recognized Perplexity's "extensive contacts with this state— such as hiring key employees in New York, leasing office space in New York, and targeting New York users with advertisements and New York-specific webpages, coupled with offering an interactive website and mobile app in New York." *Id.* at *13.

24.    Finally, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(a). As described above, Perplexity and/or its agents reside in this District and/or may be found in this State and District.

**FACTUAL ALLEGATIONS**

I.      **The Chicago Tribune's History and Mission**

     **A.  The Chicago Tribune's 178 Years of Objective Reporting**

25.     Plaintiff Chicago Tribune Company, LLC is the publisher of the *Chicago Tribune*. Established in 1847, eight years later the *Tribune* emerged as one of the first and leading voices for "Free Soil" and the abolition of slavery in the United States. The *Tribune* was an early promoter of Abraham Lincoln's 1860 presidential candidacy and ardently supported his administration. Following the Civil War, the *Tribune* remained a leading voice in the industrial Midwest during the late 19th and 20th centuries. Its impact on national and international news has been significant. In 1919, the *Tribune* was the first to obtain and publish the text of the Treaty of Versailles, which ended the First World War. On May 1, 1974, the *Tribune* was the first newspaper to publish a full transcript of President Richard Nixon's Oval Office tapes, leading to his resignation in August of that year. In 1933, the *Tribune*'s sports editor created the first Major League Baseball all-star game. The *Tribune* staff and reporters have won 28 Pulitzer Prizes, including most recently in 2022 (in the Local Reporting category, for a series on Chicago's deficient building- and fire-safety code enforcement); in 2017 (for Feature Photography, depicting a boy and his mother as their lives moved forward after he survived a shooting); and in 2017 (Public Service, for reporting on harmful pharmacy practices, and particularly noting that the reporting led to reforms that prevented future harm).

26.     The Chicago Tribune expends significant time and effort investigating and reporting local stories and rely on ad and subscription revenue to further this enterprise. Perplexity's actions threaten the Chicago Tribune's continued efforts to provide quality, in-depth local journalism by copying, using, and adapting the Chicago Tribune's content in connection with GenAI products without compensation to Chicago Tribune. These actions deprive the Chicago

Tribune of visits to its site, decrease subscription revenue, and deprive the Chicago Tribune of licensing revenue.

27.     To preserve the vitality of local journalism, the Chicago Tribune goes to great lengths to protect its content. It routinely registers copyrights in its content and provides copyright notices in connection with its works. Beyond the protections provided by the exclusive rights of reproduction, adaptation, publication, performance, and display under copyright law, the Chicago Tribune uses paywalls to protect some of its content and implements terms of service and terms of use that restrict the use of the content provided on its website.[18]

28.     The Chicago Tribune requires that any third party that wishes to use its content obtain a license to do so. These licensing agreements allow the Chicago Tribune to control how third parties receive and display its content. The Chicago Tribune licenses its content only under narrowly tailored terms that provide explicit guardrails regarding how and to what extent third parties can use the licensed content.

29.     Even under these licensing agreements, third parties are not permitted to "scrape" the content from the Chicago Tribune's website, as Perplexity has done without permission. Instead, the Chicago Tribune retains control over how third parties access licensed content by requiring them to use specific channels to obtain Chicago Tribune content.

### B.  GenAI Products Threaten High-Quality Journalism

30.     It has become more difficult for the public to sort fact from fiction in today's information ecosystem, as misinformation floods the internet, television, and other media. If the Chicago Tribune and other news organizations cannot produce and protect their independent journalism, there will be a vacuum that no computer or AI can fill.

---

[18] *See* Tribune Publishing, *Central Terms of Service*, https://www.tribpub.com/central-terms-of-service/ (last visited Dec. 4, 2025).

31.    The protection of the Chicago Tribune's intellectual property is critical to its continued ability to fund world-class journalism in the public interest. If the Chicago Tribune and its peers cannot control the use of their content, their ability to monetize that content will be harmed. With less revenue, news organizations will have fewer journalists able to dedicate time and resources to important, in-depth stories, which creates a risk that those stories will go untold. Less journalism will be produced, and the cost to society will be enormous.

32.    The Chicago Tribune depends on its exclusive rights of reproduction, adaptation, publication, performance, and display under copyright law to resist these forces. The Chicago Tribune maintains paywalls and implemented terms of service that set limits on the copying and use of its content. To use the Chicago Tribune's content for commercial purposes, a party should first approach the Chicago Tribune about a licensing agreement.

33.    Third parties are required to obtain permission before using the Chicago Tribune's content and trademark for commercial purposes and have licensed its content under negotiated licensing agreements. These agreements help ensure the Chicago Tribune controls how, where, and for how long its content and brand appears and that it receives fair compensation for third-party use.

34.    The Chicago Tribune's ability to continue to attract and grow its digital subscriber base and to generate digital advertising revenue depends on the size of the Chicago Tribune's audience and users' sustained engagement directly with Chicago Tribune's website and mobile application. Inherent in this value exchange is the idea that the search engines will direct users to the Chicago Tribune's own website and mobile application, rather than exploit the Chicago Tribune's content to keep users within their own search ecosystem.

35.     While the Chicago Tribune, like virtually all online publishers, permits search engines to access its content for the limited purpose of surfacing it in traditional search results, the Chicago Tribune has never given permission to Perplexity to use its content for GenAI purposes.

36.     On October 14, 2025, counsel for MediaNews Group ("MNG"), of which the Chicago Tribune is a member, wrote Perplexity to obtain assurance that "MNG's proprietary content has not been and is not being used by Perplexity AI, Inc. . . . . (i) to train or otherwise develop generative artificial intelligence ("GAI") tools or models . . . and/or (ii) to create or provide responses to GAI assisted search queries (such as through retrieval augmented searches)."[19] MNG counsel further notified Perplexity: "We have demonstrable reason to conclude that Perplexity has appropriated and continues to appropriate MNG's proprietary, original, and high-quality content, without either MNG's permission or legal authorization, to train GAI tools or models and/or to generate substantive responses to user search queries or prompts, all with the purpose and effect of competing with and/or displacing the content MNG offers consumers."[20] On November 10, 2025, counsel for Perplexity responded, stating that "Perplexity does not train any models with [MNG's] content."[21] Perplexity acknowledged that "[i]n certain cases, Perplexity may receive non-verbatim factual summaries . . . but does not obtain or rely on the full text of articles . . . ."[22] Perplexity counsel noted that "[t]o our knowledge, and where robots.txt[23] is in place, Perplexity has not accessed or obtained protected MNG content."[24] As described below, Perplexity's

---

[19] Letter from Rothwell Figg to Latham & Watkins, LLP, counsel for Perplexity, at 1 (Oct. 14, 2025).

[20] *Id.*

[21] Letter from Latham & Watkins, LLP, counsel for Perplexity, to Rothwell Figg, at 2 (Nov. 10, 2025).

[22] *Id.*

[23] A robots.txt file instructs web crawlers which portions of a website they can or cannot access.

[24] Letter from Latham & Watkins, LLP, *supra* note 21 at 2.

counsel's representations were incorrect. Perplexity did, and continues to, obtain and provide in its outputs verbatim and substantially similar copes of Chicago Tribune content.

## II.    Perplexity's Business and Generative AI Technology

37.    Backed by investors, Perplexity was valued at $20 billion in its latest funding round. It has said that it currently delivers more than 100 million generative search results each week. Earlier this year, its founder and CEO, Aravind Srinivas, stated that Perplexity had handled 780 million search queries in May 2025.[25] On June 24, 2025, news outlets reported that technology giants like Meta and Apple have been considering Perplexity as a potential target for acquisition.[26]

38.    The LLMs—a type of AI system that generates human-like language—upon which Perplexity's AI products are built are called "generative" AI because they are capable of generating content, such as text, images, audio, or other data. LLMs work by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train them. They use algorithms to weigh the relevance of different parts of the input data when generating text. LLM operators "train" their models on vast datasets of written material, allowing them to encode patterns and relationships between words and sentences.

39.    Once trained, LLMs can generate human-like text by taking a seed input (*e.g.*, a question or prompt) and iteratively predicting the most likely next word based on the patterns it has learned. Through this process, LLMs can generate answers to questions about information that is included in their training data. They are also capable of taking documents as input, then summarizing or answering questions about those documents. The quality of the output depends on

---

[25] Aisha Malik, *Perplexity received 780 million queries last month, CEO says*, Tech Crunch (June 5, 2025), https://techcrunch.com/2025/06/05/perplexity-received-780-million-queries-last-month-ceo-says/.

[26] *See, e.g.*, Lisa Eadicicco, *What is Perplexity, the AI startup said to be catching Meta and Apple's attention*, CNN (June 24, 2025), https://www.cnn.com/2025/06/24/tech/perplexity-ai-search-engine-meta-apple.

the size of the model, the diversity of training data, and the specific architecture and training techniques used.

40.     Perplexity has publicly stated that, in addition to leveraging other companies' LLMs, including those of OpenAI, Meta, Anthropic, Google, xAI, and Kimi,[27] it offers a proprietary Sonar family of LLMs specifically designed to support its GenAI Products. For example, Perplexity fine-tuned (or "post-trained") open source LLMs using NVIDIA's NeMo product "to create custom models for [its] online answer engine."[28] Similarly, Perplexity stated that its Sonar LLM is built on Meta's open source Llama 3.3 70B LLM, which had been "further trained to enhance answer factuality and readability for Perplexity's default search mode." [29] Perplexity specifically fine-tuned the Sonar LLMs to support "real world use cases" such as "[b]rowsing news, sports, health and finance content."[30] As an example, Perplexity describes how Sonar can receive a user query asking "What is the latest news in AI research?" and generate a grounded answer using content copied from five different news websites.[31] As of February 11, 2025, Perplexity made Sonar available as a default model for its API.[32]

41.     LLMs may also be deployed in conjunction with a technique called "retrieval-augmented generation" ("RAG"), also known as "grounding." Once trained, LLMs may be provided with information specific to a use case or subject matter in order to "ground" their

---

[27] Perplexity, *What advanced AI models are included in my subscription?*, https://www.perplexity.ai/help-center/en/articles/10354919-what-advanced-ai-models-are-included-in-my-subscription (last visited Dec. 4, 2025).

[28] NVIDIA, *Perplexity Enhances Model Performance for AI-Powered Search Engines With NVIDIA NeMo*, https://www.nvidia.com/en-us/customer-stories/perplexity-enhances-model-performance-with-nemo/  (last visited Dec. 4, 2025).

[29] Perplexity Team, *Meet Sonar: A Blazing Fast Moel Optimized for Perplexity Search*, (Feb. 11, 2025) https://www.perplexity.ai/hub/blog/meet-new-sonar.

[30] Perplexity, *Sonar*, https://docs.perplexity.ai/getting-started/models/models/sonar (last visited Dec. 4, 2025).

[31] *Id.*

[32] Perplexity, *supra* note 27.

16

outputs. For example, an LLM may be asked to generate a text output based on specific external data, such as a document, provided as context. Using this method, Perplexity's GenAI Products: (1) receive an input, such as a prompt; (2) retrieve relevant content related to the input prior to generating a response; (3) combine the original input with the retrieved documents in order to provide context; and (4) provide the combined data to an LLM, which generates a human-like language response.

42.     Perplexity has built a search index, or database, comprising "hundreds of billions of webpages" that it crawled and scraped from the internet to use as part of the RAG process.[33] More specifically, Perplexity "built an exabyte-scale index and crawling apparatus," and its "crawler and indexing fleets collectively comprise tens of thousands of CPUs and hundreds of terabytes of RAM."[34] Perplexity generates the "answers" to user prompts and questions by using content it retrieves from its search index or obtains in real-time from available sources (collectively, "RAG Content"). As Perplexity itself explains, "Perplexity leverages sophisticated AI to interpret your question" and then "searches the internet, gathering information from authoritative sources like articles, websites, and journals."[35]

43.     Mr. Srinivas described the periodicity of Perplexity's RAG scraping as follows: "I don't remember off the top of my head what is the exact periodicity, but it's pretty frequent, like at least [] every few hours. It is using retrieval augmented generation."[36]

---

[33] Perplexity Team, *Introducing the Perplexity Search API* (Sept. 25, 2025), https://www.perplexity.ai/hub/blog/introducing-the-perplexity-search-api.

[34] Perplexity Research, *supra* note 8.

[35] Perplexity, *supra* note 2.

[36] Outset Capital, *Perplexity CEO Aravind Srinivas, Thursday Nights in AI* (July 18, 2023), at 24:58-25:20, https://www.youtube.com/watch?v=jksGQhMtXjo.

44.    On information and belief, since it was launched in 2022, Perplexity has included the Chicago Tribune's content as RAG Content, including the Chicago Tribune's content covered by the registrations listed herein. Upon information and belief, Perplexity obtained Chicago Tribune's content by scraping content directly from the Chicago Tribune's website, or via third parties, to use as RAG Content.

45.    Indeed, Perplexity emphasized RAG and its reliance on high-quality content, like that of the Chicago Tribune's, to distinguish itself from other search engines and AI products on the market. Mr. Srinivas described that Perplexity is not a traditional search engine but rather "opening a new segment for these answer bots that support people to come do their research directly."[37] As part of its RAG model development, Perplexity has built a "a more modern version of PageRank to build a trust map of the web." [38] As part of this "trust map," Mr. Srinivas explained that they placed a higher value on high-quality newspapers, stating, "For example, sites like *The New York Times* are generally more reliable than Substack posts, which may be more opinionated."[39]

46.    Perplexity publicly emphasizes its ability to provide news content. On August 15, 2025, Mr. Srinivas was interviewed on the Hard Fork Podcast[40] and explained, "you don't want to just build an Apple News-like model. But it's going to be closer to Apple News with some

---

[37] *Id.* at 29:49 ("We found like a lot of users like using it for research. Lots of these questions that you have in your day to day life that involve you to like do some amount of research, whether it's a few minutes, a few hours, our product just nails it and that's where we have found a lot of usage, and hence why I think it's not really like a Google competition, even though [it] is very easy to say that. It's more like opening a new segment for these answer bots that support people to come do their research directly.").

[38] Joanne Chen, *How Perplexity.ai Is Pioneering The Future Of Search*, Forbes (Sept. 6, 2023), https://www.forbes.com/sites/joannechen/2023/09/06/how-perplexityai-is-pioneering-the-future-of-search/.

[39] *Id.*

[40] Hard Fork, *GPT-5 Backlash + Perplexity C.E.O. Aravind Srinivas on the Browser Wars + Hot Mess Express* (Aug. 15, 2025) https://www.nytimes.com/2025/08/15/podcasts/hardfork-gpt5-perplexity.html?showTranscript=1.

protections for users. So say they can have AIs also read those articles. And the publishers get rewarded. So that's how I'm thinking about it."[41]

47.    Perplexity markets itself as a superior research tool compared to other search engines and AI products because of its RAG integration, which allows Perplexity to "always retrieve relevant documents and pick relevant paragraphs from each document and use those documents and paragraphs to write your answer for that query."[42] Indeed, Perplexity's reproduction and dissemination of existing content, including copyrighted information, is highlighted by Perplexity as the primary reason to pick Perplexity over similar platforms. As Mr. Srinivas explained: "The principle in Perplexity is you're not supposed to say anything that you don't retrieve, which is even more powerful than RAG because RAG just says, 'Okay, use this additional context and write an answer.' But we say, 'Don't use anything more than that too.' That way we ensure a factual grounding."

48.    Mr. Srinivas has stressed the importance of RAG not only to Perplexity but to the future of generative AI generally. According to Mr. Srinivas, RAG is the framework that can train AI to have the context to answer a user query. Responding to a question about the most promising frontier where the next breakthrough in generative AI may come, Mr. Srinivas directly referenced RAG and the importance of context:

> I think the real breakthrough could potentially come from figuring out extremely long context. So currently, all the AIs are doing something called the retrieval-augmented generation, including Perplexity. It's called RAG, where the model itself doesn't have the full context to answer your question. And so it pulls the relevant context from some data store, be it the web index or some other data index, and puts it into the prompt, and then answers your question. But your life—let's say 10 years of

---

[41] *Id.*

[42] Lex Fridman, *Aravind Srinivas: Perplexity CEO on Future of AI, Search & the Internet | Lex Fridman Podcast #434* (June 19, 2024), at 01:56:48, https://www.youtube.com/watch?v=e-gwvmhyU7A.

your life—all the context in it cannot be compressed that easily. And what if you wanted to chat with an AI in the same way you would chat with a friend that you've known for a decade, where you don't have to keep starting new chats to talk about different things? It's all one single stream of chat. I think that's very hard to do right now. And so figuring out extremely long contexts, like one million or 10 million tokens or even infinite tokens—with, What is the right structure to store all the memories?—is still an open problem.[43]

49.     Perplexity's stated objective of "not saying anything that it doesn't retrieve" requires high-quality RAG Content on an ongoing basis. Mr. Srinivas's interview with interviewer Lex Fridman is telling in this regard:

> Fridman: Yeah, let's just linger on that. So in general, RAG is doing the search part with a query to add extra context to generate a better answer?
>
> Srinivas: Yeah.
>
> Fridman: I suppose you're saying **you want to really stick to the truth that is represented by the human-written text on the internet**?
>
> Srinivas: **Correct**.[44]

50.     RAG—whether called retrieval-augmented generation, grounding, retrieving, or contextualizing—is not possible without high-quality, fact-checked content like that of the Chicago Tribune. Human beings report, research, write, edit, and create the content that Perplexity takes without permission or compensation. Perplexity expressly depends on, and engages in massive copying of, this content to distinguish itself in the marketplace. While benefiting from content, including that of the Chicago Tribune, Perplexity has failed to pay for it, instead choosing to copy it and unlawfully appropriate intellectual property created by human authors.

---

[43] Harvard Business School, *Perplexity CEO Aravind Srinivas: From Academic to $9B AI Pioneer | HBS Entrepreneurship Summit 2025* (Apr. 25, 2025), at 31:42. https://www.youtube.com/watch?v=Rkizxztabt8.

[44] Fridman, *supra* note 42, at 01:57:27-01:57:39 (emphasis added).

### III.    **Perplexity's Unauthorized Use and Copying of the Chicago Tribune's Content**

51.    Perplexity's GenAI Products infringe on the Chicago Tribune's copyrights at two primary stages.

### A.  **Perplexity Infringes the Chicago Tribune's Copyrights at the Input Stage**

52.    Perplexity copies the Chicago Tribune's content by crawling and scraping the Chicago Tribune's website and others with its own crawlers like PerplexityBot and Perplexity-User, as well as those of third parties on which Perplexity relies.[45] Perplexity also copies the Chicago Tribune's content by accessing and using third-party indices and databases comprised of scraped Chicago Tribune content.

53.    Perplexity uses its PerplexityBot crawler to crawl, scrape, and copy the Chicago Tribune content, including from its website, to populate Perplexity's "AI-First" search index to power its GenAI Products. In addition, Perplexity uses its Perplexity-User crawler to crawl and scrape the Chicago Tribune's content, including from the Chicago Tribune's website, in real-time to feed to its GenAI Products.

54.    Perplexity stresses that its crawlers are "designed to surface and link websites in search results on Perplexity" and are "not used to crawl content for AI foundation models."[46] Notwithstanding Perplexity's representation that its crawlers are not used for "AI foundation models," Perplexity specifically designs and uses its crawlers to obtain RAG Content to answer user queries. Without employing researchers, writers, or editors, Perplexity boasts that its "content is sourced from the web in real-time as you ask your questions, ensuring you receive the most up-

---

[45] Mark Sullivan, *Perplexity CEO Aravind Srinivas responds to plagiarism and infringement accusations*, Fast Company (June 21, 2024), https://www.fastcompany.com/91144894/perplexity-ai-ceo-aravind-srinivas-on-plagiarism-accusations (deflecting blame that Perplexity's crawlers don't respect robots.txt protocol by saying Perplexity relies on crawlers of unidentified "third-party provider of web crawling and indexing services").

[46] Perplexity, *Perplexity Crawlers*, https://docs.perplexity.ai/guides/bots (last visited Dec. 4, 2025).

to-date information available."[47] Perplexity further highlights its "credible sources," emphasizing that "all responses are supported by citations from reputable news organizations, academic publications, and established content sources."[48]

55. In doing so, Perplexity and/or its agents at times have intentionally ignored or evaded technical content protection measures, such as robots.txt, designed specifically to guard against such crawling and to instruct web crawlers to refrain from copying digital content. In fact, Perplexity openly admits that its Perplexity-User crawler "generally ignores robots.txt rules."[49] WIRED has further reported how "[i]n theory, Perplexity's chatbot shouldn't be able to summarize WIRED articles, because our engineers have blocked its crawler via our robots.txt file,"[50] and "Perplexity claims to respect the robots.txt standard." "WIRED's analysis found that in practice, though, prompting the chatbot with the headline of a WIRED article or a question based on one will usually produce a summary appearing to recapitulate the article in detail."[51]

56. An independent developer, Robb Knight, has further reported his investigation and findings that "Perplexity had apparently ignored his robots.txt file and evaded his firewall."[52] Upon information and belief, Perplexity uses "an automated web browser running on a server with an IP address that the company does not publicly disclose."[53] The lack of disclosure means that its bots/user agents do not identify themselves, so that websites like the Chicago Tribune's cannot

---

[47] Perplexity, *supra* note 5.

[48] *Id.*

[49] Perplexity, *supra* note 46.

[50] Dhruv Mehrotra & Tim Marchman, *Perplexity Is a Bullshit Machine*, Wired (June 19, 2024), https://www.wired.com/story/perplexity-is-a-bullshit-machine/ (describing how Perplexity "is surreptitiously scraping—and making things up out of thin air").

[51] *Id.*

[52] *Id.*; *see also* Robb Knight, *Perplexity AI Is Lying about Their User Agent* (June 19, 2024), https://rknight.me/blog/perplexity-ai-is-lying-about-its-user-agent/.

[53] Mehrotra & Marchman, *supra* note 50; Knight, *supra* note 52.

recognize or block Perplexity unidentified crawlers from scraping their websites. WIRED reports that Conde Nast engineers' analysis of its system logs shows that Perplexity's undisclosed IP address "likely . . . has accessed the company's content thousands of times without permission."[54]

57.    Most recently, four independent investigators reported that they "are observing stealth crawling behavior from Perplexity," after they conducted testing upon receiving complaints from customers who specifically blocked Perplexity's declared crawlers but found that "Perplexity was still able to access their content even when they saw its bots successfully blocked."[55] They found that even when websites explicitly prohibit Perplexity from automated access to their content via robots.txt and other Web Application Firewall rules, Perplexity nonetheless scraped their detailed content by using undeclared user agents "intended to impersonate Google Chrome on macOS when their declared crawler was blocked."[56] Perplexity's crawler "utilized multiple IPs not listed in Perplexity's official IP range" in order to "evade website blocks."[57]

58.    Though robots.txt blocks should have been enough to deter Perplexity from accessing the Chicago Tribune's website, it was not. Perplexity still made over 16,700 attempts to access the Chicago Tribune's website in the last six months alone. Moreover, Perplexity continues to access and use the Chicago Tribune's content for RAG, as evidenced most clearly by the verbatim and substantially similar Perplexity outputs described below. Upon information and belief, Perplexity has used similar undisclosed methods to access the Chicago Tribune's content without permission.

---

[54] Mehrotra & Marchman, *supra* note 50.

[55] Gabriel Corral, Vaibhav Singhal, Brian Mitchell & Reid Tatoris, *Perplexity is using stealth, undeclared crawlers to evade website no-crawl directives*, Cloudflare (Aug. 4, 2025), https://blog.cloudflare.com/perplexity-is-using-stealth-undeclared-crawlers-to-evade-website-no-crawl-directives/.

[56] *Id.*

[57] *Id.*

23

**B. Perplexity Infringes the Chicago Tribune's Intellectual Property at the Output Stage**

59.     The lengthy outputs from Perplexity's GenAI Products often contain full or partial verbatim reproductions of the Chicago Tribune's copyrighted articles, particularly when a user asks a question about what the Chicago Tribune has reported. At other times, the outputs are reworded into text that closely paraphrases or summarizes in detail the Chicago Tribune's copyrighted works. These reproductions go far beyond the snippets typically shown with ordinary search results. Moreover, when a user asks for further details regarding these outputs, Perplexity often provides such details—including extensive verbatim language. Even when Perplexity's outputs include links to source materials, users have less need to navigate to those sources because their expressive content is already quoted or paraphrased in the narrative result. Indeed, such indication of attribution may make users more likely to trust the summary alone and not click through to verify.

60.     In this way, Perplexity's RAG outputs divert traffic away from copyright holders like the Chicago Tribune. A user who has already read the latest news or found the right kind of product, even—or especially—with attribution to the Chicago Tribune, has little reason to visit the original source.

61.     Below are illustrative, non-exhaustive examples of Perplexity's copyright infringing outputs.

(i)     Perplexity's Chatbots

62.     Perplexity's flagship consumer GenAI product is an AI chatbot search engine—which Perplexity refers to as an "answer engine"—that will readily output infringing copies and derivatives of Chicago Tribune's content.

63.     As an illustrative example, Perplexity's chatbot provides an output substantially

similar to the text from the Chicago Tribune article titled "Blue Line horror brings a day of reckoning for the SAFE-T Act and hapless electronic monitoring in Cook County."[58]

[example follows on next page]

---

[58] Editorial Board, *Editorial: Blue Line horror brings a day of reckoning for the SAFE-T Act and hapless electronic monitoring in Cook County*, Chicago Tribune (Nov. 25, 2025), https://www.chicagotribune.com/2025/11/25/editorial-blue-line-attack-lawrence-reed-tim-evans-cook-county-judges-electronic-monitoring/.



# Please provide the first five paragraphs

**Perplexity Sports**
Follow live game scores, schedules, and stats on Perplexity Sports.  >

The first five paragraphs of the article "Blue Line horror brings a day of reckoning for the SAFE-T Act and hapless electronic monitoring in Cook County" are as follows:

1. The case of Lawrence Reed, a 50-year-old man accused of dousing a young woman with gasoline and igniting her on a CTA Blue Line train, epitomizes a troubling scenario for those championing reforms in the criminal justice system, particularly concerning the SAFE-T Act.

2. This Illinois legislation, which was first instituted in 2021, notably abolished cash bail for individuals charged with crimes, regardless of whether they are violent offenders or not, while they await trial. Instead, the law introduced a framework where prosecutors are responsible for requesting that judges keep defendants in custody if they are considered a flight risk or a danger to the community. Ultimately, judges hold the authority to decide whether to detain these individuals while they await their court appearance.

3. Prior to the alleged assault on the 26-year-old woman, Reed had a significant criminal history, with over 70 previous arrests and a record of mental health issues. He had recently been accused of another violent offense—aggravated battery—and was released in August against the wishes of a Cook County prosecutor by Judge Teresa Molina-Gonzalez. At that time, she remarked, "can't everybody in because the attorney wants me to."

4. Those words are likely to haunt Molina-Gonzalez when she faces voters again. However, the events following Molina-Gonzalez's controversial ruling raise serious concerns. Thanks to meticulous reporting by the crime news outlet CWB, we have gained insight into how the legal system failed the woman who remains in critical condition at this moment.

5. Just prior to the incident on the evening of November 17, Reed was reportedly out of his residence, breaching his curfew for most of the preceding weekend, as indicated by a court filing from the pretrial services under Cook County Chief Judge Timothy Evans. This office now oversees the county's electronic monitoring program, which tracks individuals under home confinement instead of incarceration.

These paragraphs set the context for the critical assessment of the SAFE-T Act and electronic monitoring policies in Cook County, highlighting systemic failures that contributed to this tragic incident. `chicagotribune` +1

64.    In the example provided above, Perplexity's consumer chatbot paraphrases the Chicago Tribune's article while still reproducing the Chicago Tribune's protected expression. As described above, this infringing output would not be possible without Perplexity accessing and copying the Chicago Tribune's content, and its use of this content as input in Perplexity's RAG

process.

65.    Perplexity will also provide content from the Chicago Tribune when the Tribune is not referenced in the prompt. For example, when asked, "Has there been reporting about Chicago's history of failed fire safety code enforcement? Provide quotes from the reporting in detail," Perplexity's chatbot included the below in its response, which contains passages from the Chicago Tribune's 2021 Pulitzer Prize winning article "42 Fires, 61 Deaths: A Story of Failed City Oversight."[59]

> Has there been reporting about Chicago's history of failed fire safety code enforcement? Provide quotes from the reporting in detail

Yes. Multiple investigations and articles have documented a long history of weak or failed fire-safety and building code enforcement in Chicago, often tied to deadly fires. Below are detailed passages from major reporting.

### Chicago Tribune / Illinois Answers: "42 Fires, 61 Deaths: A Story of Failed City Oversight" (2021)

This joint investigation examined 42 fatal fires from 2014–2019 where the city had prior warnings about safety problems but did not act effectively. One passage describes how repeated violations and bureaucratic failures preceded a fatal fire:

> "The building is cited for more than 88 code violations over eight years before the fire. Six months before the fire, a tenant calls 311 to complain there is no smoke detector in a unit. Although public records do not identify the caller, the person says they have a 3-year-old child. Five months later, inspectors report being unable to get inside during an annual inspection. The complaint is mistakenly closed as a 'duplicate,' even though records show it is not. The fire occurs one month later." chicagotribur +1

---

[59] Cecilia Reyes, Chad Yoder, and Madison Hopkins, *42 Fires, 61 Deaths: A Story of Failed City Oversight*, Chicago Tribune (April 23, 2021), https://www.chicagotribune.com/2021/04/23/42-fires-61-deaths-a-story-of-failed-city-oversight/.

"During two separate inspections in the three months before the fire, city inspectors find 35 violations at the property, including serious electrical violations and a lack of smoke detectors at the main building. A month later, city lawyers file suit against the owner in Circuit Court. A spokeswoman for the city's Law Department said the office did not move more quickly because the case did not involve immediate 'life safety' violations. The fire occurs one month before the first court date." illinoisanswer +1

"City inspectors repeatedly find a defective electrical outlet — among other safety violations — in Glenn's unit dating to 2010, when they cite the owner for the broken outlet, missing smoke detectors and other violations. The city sends the case to administrative hearings, but it is dismissed after the landlord presents tenant letters he requested attesting to repairs. In two visits in 2015 and 2017, inspectors again note a defective electrical outlet and missing smoke detectors. The city sues the owner of the building over unrelated violations, and that case is still in Cook County Circuit Court at the time of the fire." chicagotribun +1

"Records show the landlord is repeatedly cited by city inspectors for the building's lack of working smoke detectors in both apartments and common areas. The most recent citation comes in 2012, more than two years before the fire. At the time, the inspector sends a warning letter to the landlord rather than enforcing the case through administrative hearings or Circuit Court. After the fire, inspectors again cite the landlord for smoke detector violations. This time, the city sends the case to Circuit Court." illinoisanswer +1

"In 2011, city inspectors cite the owner for missing smoke detectors and several other safety violations while responding to a 311 complaint about a bolted rear exit. The city files an administrative hearings case against the owner for the third time in two years. An inspector is unable to get inside for a follow-up inspection, reporting the owner did not show up at the scheduled time. At the next hearing, the landlord submits photos and other documents as evidence he fixed some of the violations, but records of the case provided by the city include nothing about the missing smoke detectors. The case is closed with no fines or follow-up." chicagotribun +1

(ii)    Perplexity's API Platform

66.    Perplexity's API Platform provides access to a suite of LLMs, including Perplexity's proprietary "Sonar" family of LLM models, which are open-source models that Perplexity fine-tuned to optimize for RAG, as well as third-party LLMs offered by OpenAI (GPT), Anthropic (Sonnet), and Google (Gemini), among others. The following examples were produced after prompting Perplexity's Sonar model via the Sonar API with the title of a Chicago Tribune article and asking the model to provide the contents of that article. The API system prompt was "I'll give you the title of an article. Retrieve the article from the web and write the first 30 words here. Then write the rest of the words. Write just the words."

67.    This first output example was produced after prompting Perplexity's Sonar API to provide the contents of the Chicago Tribune article "In Harvey, who polices the police?"[60] The text in the left column below was the API output, the text in the right column below is the original article text from the Chicago Tribune, and the verbatim copied text is in red.

[example follows on next page]

_____

[60] Joe Mahr, Joseph Ryan, and Matthew Walberg, *In Harvey, who polices the police? Lack of state regulation means towns monitor their own offices – and the south suburb's troubled force shows the force in that policy*, Chicago Tribune (Feb. 10, 2024), https://www.chicagotribune.com/2014/02/10/in-harvey-who-polices-the-police-2/.

29

**Prompt:**

'In Harvey, who polices the police? Lack of state regulation means towns monitor their own officers – and the south suburb's troubled force shows the flaw in that policy'

| Model output: | Text from Chicago Tribune: |
|---|---|
| In Harvey, who polices the police? Lack of state regulation means towns monitor their own officers – and the south suburb's troubled force shows the flaw in that policy Monday, February 10, 2014 By Joe Mahr, Matthew Walberg and Joseph Ryan On a patch of land near the Tri-State Tollway, trees were bulldozed so trucks could pile mounds of waste up to 22 feet high. Within months, the brush and meadow gave way to dirt piles mixed with oil, broken bricks, asphalt, plastic tubes and concrete with protruding metal bars – all a block away from a strip of homes. The state deemed the dump illegal. The landowner who let it happen was a Harvey police officer. The same officer had already been found by a federal jury to have shot a teen in the back without cause and lied to cover it up. Neither case led the state to yank the officer's gun and badge. This is Illinois, where the state-imposed ethical standards for a cosmetologist are far higher than those for a cop. A Tribune investigation found that police departments are largely left to police their own in what can be a **Wild West** of ethical lapses – unlike the high standards of some other states, or even the higher standards Illinois imposes on other professions. And that reality allows Illinois officers with questionable pasts to remain in what is supposed to be among the most trusted professions. There are stories across the Chicago area of sketchy officers who somehow kept their police powers. But perhaps the clearest view of the breakdown of oversight – and its effects – can be seen in Harvey. The Tribune reported Sunday on the south suburb becoming arguably the most lawless place in the area, with chronically high violent crime rates and few arrests, and about the people who suffer as a result. In the latest investigation, the newspaper has found that state law allowed the department to keep officers whose work records are full of allegations of wrongdoing – incidents that could have gotten them disciplined by the state if they were accountants, physical therapists or dental hygienists. In one example, a special state panel gave a bravery award to a Harvey officer two months after he was accused of slamming a pregnant teen to the ground so severely that she miscarried. A Cook County juvenile judge later found that the officer's explanation of what happened with | On a patch of land near the Tri-State Tollway, trees were bulldozed so trucks could pile mounds of waste up to 22 feet high. Within months, the brush and meadow gave way to dirt piles mixed with oil, broken bricks, asphalt, plastic tubes and concrete with protruding metal bars – all a block away from a strip of homes. The state deemed the dump illegal. The landowner who let it happen was a Harvey police officer. The same officer had already been found by a federal jury to have shot a teen in the back without cause and lied to cover it up. Neither case led the state to yank the officer's gun and ba dge. This is Illinois, where the state-imposed ethical standards for a cosmetologist are far higher than those for a cop. A Tribune investigation found that police departments are largely left to police their own in what can be a Wild West of ethical lapses – unlike the high standards of some other states, or even the higher standards Illinois imposes on other professions. And that reality allows Illinois officers with questionable pasts to remain in what is supposed to be among the most trusted professions. There are stories across the Chicago area of sketchy officers wh o somehow kept their police powers. But perhaps the clearest view of the breakdown of oversight – and its effects – can be seen in Harvey. The Tribune reported Sunday on the south suburb becoming arguably the most lawless place in the area, with chronically high violent crime rates and few arrests, and about the people who suffer as a result. In the latest investigation, the newspaper has found that state law allowed the department to keep officers wh ose wo rk re cords ar e fu ll of allegations of wrongdoing – incidents that could have gotten them disciplined by the state if they were accountants, physical therapists or dental hygienists. In one example, a special state panel gave a bravery award to a Harvey officer tw o mo nths af ter he was accused of slamming a pregnant teen to the ground so severely that she miscarried. A Cook County juvenile judge later found that the officer's explanation of what happened with the teen was not credible, according to court records. That didn't trigger a state review. As for the officer wh o sh ot th e te en and allowed the dump, he rose to become a veteran detective in Harvey, entrusted with investigating some |

This article is registered with the U.S. Copyright Office as part of Registration No. TX0009386276.

68.     Notably, this output was generated using Perplexity's Sonar Pro API, which

Perplexity markets as allowing users to "build your own generative search capabilities powered with unparalleled real-time, web-wide research" with the ability to "customize sources (our most requested feature updates!)"[61] Unlike Perplexity's free AI "search and chat," Sonar Pro API requires paid subscription, as detailed in the following chart.[62]

**Token pricing** is based on the number of tokens in your request and response.

| Model | Input Tokens ($/1M) | Output Tokens ($/1M) | Citation Tokens ($/1M) |
|---|---|---|---|
| Sonar | $1 | $1 | - |
| Sonar Pro | $3 | $15 | - |
| Sonar Reasoning | $1 | $5 | - |
| Sonar Reasoning Pro | $2 | $8 | - |
| Sonar Deep Research | $2 | $8 | $2 |

69.    Significantly, when prompting the free Perplexity search engine with the same prompt as the first output example, Perplexity responds that the content "cannot be provided due to copyright restrictions." Nevertheless, for a fee paid to Perplexity, but not to the Chicago Tribune, Perplexity willfully violates those same protections.

70.    A second output example was produced after prompting Perplexity's Sonar API to provide the contents of the Chicago Tribune article "Bailey relatives garnered public cash State land deal, federal payments sent millions to members of family."[63] The text in the left column below was the API output, the text in the right column below is the original article text from the

---

[61] Perplexity Team, *Introducing the Sonar Pro API* (Jan. 21, 2025), https://www.perplexity.ai/hub/blog/introducing-the-sonar-pro-api.

[62] Perplexity, *Pricing*, https://docs.perplexity.ai/getting-started/pricing (last visited Dec. 4, 2025).

[63] Ray Long, *Why Gov. J.B. Pritzker's administration ended up giving millions of dollars to relatives of his Republican rival, Darren Bailey*, Chicago Tribune (Sept. 19, 2022), https://www.chicagotribune.com/2022/09/18/why-gov-jb-pritzkers-administration-ended-up-giving-millions-of-dollars-to-relatives-of-his-republican-rival-darren-bailey/.

Chicago Tribune, and the verbatim copied text is in red.

**Prompt:**
'Bailey relatives garnered public cash State land deal, federal payments sent millions to members of family'

**Model output:**

Republican candidate for governor Darren Bailey regularly rails against government spending while accusing Democratic Gov. J.B. Pritzker of trying to solve the state's problems merely by tossing money into 'the four winds.' 'That's all we ever hear for solutions in Illinois – more money, more spending,' Bailey said at a campaign appearance earlier this month. 'That more money and more spending never comes with more accountability and more transparency. That's all this man's done, is continue to spend and waste taxpayers' money.' But absent from Bailey's criticism is recognition that his father, mother and sister have benefited from two transactions over the last two decades worth more than $8 million in federal and state funds tied to a sprawling spread of property the trio owned in southern Illinois, including $4.32 million from, oddly enough, the Pritzker administration, according to records obtained by the Tribune. In the little-noticed transaction in 2021, Pritzker's Department of Natural Resources bought from the Baileys more than 2,290 acres of mostly wetland about 100 miles south of Urbana-Champaign. The land is slated to become a public recreation and hunting area, according to state officials and financial records. Beyond the proceeds for selling the land, Bailey's relatives also collected sizable federal government payments tied to most of that same property. They entered a contract to receive $3.74 million through a... The two multimillion-dollar transactions provide the public with the latest example of the intersection between state Sen. Bailey's family and funding from governments that Bailey often decries as being too big and undisciplined with spending. Bailey, a downstate farmer and lawmaker, and his relatives also have collected millions of dollars in COVID-related assistance and federal farming subsidies over the years for their farms and other businesses. The Bailey family incomes are dwarfed by the billions of dollars amassed by entrepreneur and Hyatt Hotel heir Pritzker, a portion of which the Tribune previously found was held in several secret offshore shell companies. But the revelations about the June 2021 state land deal and the federal easement

**Text from Chicago Tribune:**

Republican candidate for governor Darren Bailey regularly rails against government spending while accusing Democratic Gov. J.B. Pritzker of trying to solve the state's problems merely by tossing money into 'the four winds.' 'That's all we ever hear for solutions in Illinois – more money, more spending,' Bailey said at a campaign appearance earlier this month. 'That more money and more spending never comes with more accountability and more transparency. That's all this man's done, is continue to spend and waste taxpayers' money.' But absent from Bailey's criticism is recognition that his father, mother and sister have benefited from two transactions over the last two decades worth more than $8 million in federal and state funds tied to a sprawling spread of property the trio owned in southern Illinois, including $4.32 million from, oddly enough, the Pritzker administration, according to records obtained by the Tribune. In the little-noticed transaction in 2021, Pritzker's Department of Natural Resources bought from the Baileys more than 2,290 acres of mostly wetland about 100 miles south of Urbana-Champaign. The land is slated to become a public recreation and hunting area, according to state officials and financial records. Beyond the proceeds for selling the land, Bailey's relatives also collected sizable federal government payments tied to most of that same property. They entered a contract to receive $3.74 million through a 2005 federal wetlands easement that required them to preserve the land as a natural habitat, according to local, state and federal records. The two multimillion-dollar transactions provide the public with the latest example of the intersection between state Sen. Bailey's family and funding from governments that Bailey often decries as being too big and undisciplined with spending. Bailey, a downstate farmer and lawmaker, and his relatives also have collected millions of dollars in COVID-related assistance and federal farming subsidies over the years for their farms and other businesses. The Bailey family incomes are dwarfed by the billions of dollars amassed by entrepreneur and Hyatt Hotel heir Pritzker, a portion of which the Tribune previously found was held in several secret offshore shell companies. But the

This article is registered with the U.S. Copyright Office as part of Registration No. TX0009202424.

71.     A third output example was produced after prompting Perplexity's Sonar API to provide the contents of the Chicago Tribune article "Baidu vs. Google The battle for the hearts and searches of China's Web surfers." [64] The text in the left column below was the API output, the text in the right column below is the original article text from Chicago Tribune, and the verbatim copied text is in red.

[example follows on next page]

---

[64]   Staff   Reports,   *Baidu*   *vs.*   *Google*,   Chicago   Tribune   (Dec.   3,   2006), https://www.chicagotribune.com/2006/12/03/baidu-vs-google/.

**Prompt:**
"Baidu vs. Google The battle for the hearts and searches of China's Web surfers"

### Model output:

Chinese search engine Baidu.com is looking ahead to the next big arena – wireless services via cell phones, which are much more common in China than personal computers. But already, it's beating Google for the Chinese search market.

Baidu founder Robin Li has become something of a national hero in China because of the search engine's success.

In the village of Laishui, about 100 miles southwest of China's capital city, Li De Yin runs a small workshop that seems frozen in pre-industrial time. Bare-chested workers heat copper bowls over an open-coal fire then hammer the yellow metal into hot pots, the Chinese version of fondue pots.    But walk into Li's tidy bedroom, and an ice-blue glow lights the room. It comes from a state-of-the-art personal computer whirring beside a twin-size bed, an audio and video hookup at the ready, in case Li needs to speak to a customer.

Online business accounts for half of Li's sales these days. And the bulk of it is generated by a search engine unknown to most Americans but a household name in China: Baidu.com.    Before he advertised online, Li limited his business to the restaurants he could serve from his truck route through southern China. Now the Baidu connection has landed clients in Taiwan, Korea and Hong Kong. "These are customers we never had before," he said. "I'm making more money. I like that. It's a good thing." For Google, though, this is not so good. The Mountain View, Calif.-based behemoth has set its sights on capturing the vast and lucrative China Internet market, the world's second-largest. But Baidu beat them to it, and the canny, swift-footed competitor is proving exceptionally tough on its home field.    Baidu has virtually copied Google's clean-screen look, but the rest of the Baidu game plan is original. It plays to nationalist advantage by attacking Google as a foreign invader. It promotes itself in such splashy ways as a huge neon sign on the banks of the Pearl River in Shanghai. And it has flourished by aggressively marketing itself in ways verboten at Google: Baidu lets advertisers pay for placement in its search results.    The formula is working. Despite a big marketing push from Google over the last year, Baidu is the first choice of 62 percent of Chinese users, up

### Text from Chicago Tribune:

In the village of Laishui, about 100 miles southwest of China's capital city, Li De Yin runs a small workshop that seems frozen in pre-industrial time. Bare-chested workers heat copper bowls over an open-coal fire, then hammer the yellow metal into hot pots, the Chinese version of fondue pots.    But walk into Li's tidy bedroom, and an ice-blue glow lights the room. It comes from a state-of-the-art personal computer whirring beside a twin-size bed, an audio and video hookup at the ready, in case Li needs to speak to a customer.

Online business accounts for half of Li's sales these days. And the bulk of it is generated by a search engine that is unknown to most Americans but a household name in China: Baidu.com.    Before he advertised online, Li limited his business to the restaurants he could serve from his truck route through southern China. Now the Baidu connection has landed clients in Taiwan, Korea and Hong Kong.    "These are customers we never had before," he said. "I'm making more money. I like that. It's a good thing." For Google, though, this is not so good. The Mountain View, Calif.-based behemoth has set its sights on capturing the vast and lucrative China Internet market, the world's second largest. But Baidu beat them to it, and the canny, swift-footed competitor is proving exceptionally tough on its home field.    Baidu has virtually copied Google's clean-screen look, but the rest of the Baidu game plan is original. It plays to nationalist advantage by attacking Google as a foreign invader. It promotes itself in such splashy ways as a huge neon sign on the banks of the Huangpu River in Shanghai (the name of the river as published has been corrected here and in a subsequent reference in this text). And it has flourished by aggressively marketing itself in ways verboten at Google: Baidu lets advertisers pay for placement in its search results.

The formula is working.    Despite a big marketing push from Google over the last year, Baidu is the first choice of 62 percent of Chinese users, up 15 points over 2005, according to a study released in September by the China Internet Network Information Center.    Google's share dropped eight points, to 25 percent—a rare setback.    If Baidu keeps winning, local players elsewhere might copy Baidu's tactics, disrupting Google's plan to expand globally. The battle

This article is registered with the U.S. Copyright Office as part of Registration No. TX0006511609.

72.    A fourth output example was produced after prompting Perplexity's Sonar API to provide the contents of the Chicago Tribune article "INSTEAD OF THERAPY, VIOLENCE AND CHAOS In Illinois residential treatment centers, youths are assaulted and sexually abused. But the state keeps sending them."[65] The text in the left column below was the API output, the text in the right column below is the original article text from the Chicago Tribune, and the verbatim copied text is in red.

[example follows on next page]

---

[65] David Jackson, Duaa Eldeib, Gary Marx, *Children attacked, abused at taxpayer-funded living center*, Chicago Tribune (Dec. 3, 2014), https://www.chicagotribune.com/2014/12/03/children-attacked-abused-at-taxpayer-funded-living-centers/.

**Prompt:**
"INSTEAD OF THERAPY, VIOLENCE AND CHAOS In Illinois residential treatment centers, youths are assaulted and sexually abused. But the state keeps sending them."

| Model output: | Text from Chicago Tribune: |
|---|---|
| Instead of therapy, violence and chaos In Illinois residential treatment centers, youths are assaulted and sexually abused. But the state keeps sending them. Wednesday, December 3, 2014 By David Jackson, Gary Marx and Duaa Eldeib In residential treatment centers across Illinois, children are assaulted, sexually abused and running away by the thousands – yet state officials fail to act on reports of harm and continue sending waves of youths to the most troubled and violent facilities, a Tribune investigation found. At a cost to taxpayers of well over $200 million per year, the residential centers promise round-the-clock supervision and therapy to state wards with histories of abuse and neglect, as well as other disadvantaged youths with mental health and behavioral problems. On any given day, about 1,400 wards live in the centers, although far more cycle through each year. In the best cases, the facilities rebuild and even save young lives. But the Tribune found that many underprivileged youths – most of them African-American – are shuttled for years from one grim institution to another before emerging more damaged than when they went in. Reports of patient-on-patient sexual assault are commonplace at some of Illinois' largest and most relied-on facilities. Child prostitution schemes take root. Vulnerable children are terrorized by older ones and taught a life of crime. Some are preyed on sexually by the adults paid to care for them. And staggering numbers of wards, some as young as 10, flee to the streets. In the three years from 2011 through 2013, Illinois residential facilities sent the state Department of Children and Family Services 428 reports alleging a ward was sexually assaulted or abused while in their care, according to DCFS records not previously made public. The facilities submitted an additional 1,052 reports that a ward was physically assaulted during those three years – in some instances by staff but usually by a[2]. | In residential treatment centers across Illinois, children are assaulted, sexually abused and running away by the thousands – yet state officials fail to act on reports of harm and continue sending waves of youths to the most troubled and violent facilities, a Tribune investigation found. At a cost to taxpayers of well over $200 million per year, the residential centers promise round-the-clock supervision and therapy to state wards with histories of abuse and neglect, as well as other disadvantaged youths with mental health and behavioral problems. On any given day, about 1,400 wards live in the centers, although far more cycle through each year. In the best cases, the facilities rebuild and even save young lives. But the Tribune found that many underprivileged youths – most of them African-American – are shuttled for years from one grim institution to another before emerging more damaged than when they went in. Reports of patient-on-patient sexual assault are commonplace at some of Illinois' largest and most relied-on facilities. Child prostitution schemes take root. Vulnerable children are terrorized by older ones and taught a life of crime. Some are preyed on sexually by the adults paid to care for them. And staggering numbers of wards, some as young as 10, flee to the streets. In the three years from 2011 through 2013, Illinois residential facilities sent the state Department of Children and Family Services 428 reports alleging a ward was sexually assaulted or abused while in their care, according to DCFS records not previously made public. The facilities submitted an additional 1,052 reports that a ward was physically assaulted during those three years – in some instances by staff but usually by a peer. And facilities notified DCFS of 29,425 incidents when a ward ran away or went missing. That is an average of nearly 27 runaway reports a day among wards in Illinois facilities. Out on the streets where they had no family, friends, money |

This article is registered with the U.S. Copyright Office as part of Registration No. TX0008180683.

73.     A fifth output example was produced after prompting Perplexity's Sonar API to provide the contents of the Chicago Tribune article "Paducah's top spots 'Top Chef' contestant

dishes on where to dine and drink in her Kentucky home." [66] The text in the left column below was the API output, the text in the right column below is the original article text from the Chicago Tribune, and the verbatim copied text is in red.

**Prompt:**
"Paducah's top spots 'Top Chef' contestant dishes on where to dine and drink in her Kentucky home"

**Model output:**

Paducah's top spots 'Top Chef' contestant dishes on where to dine and drink in her Kentucky home

When former Chicago chef Sara Bradley heard 'Top Chef' would be filming its new season in her native Kentucky, she wanted a piece of the action. Bradley, a tireless champion of Kentucky cuisine, got what she wanted. The 36-year-old chef was the sole contestant from the Bluegrass State, one of 15 competitors on Season 16 of television's Emmy Award-winning cooking competition. "I wanted to represent the energy and the culture that's happening in the food scene in Kentucky right now," said Bradley, who opened Freight House, her acclaimed farm-to-table restaurant, in Paducah, Ky., three years ago. Before launching Freight House, Bradley honed her skills working for the likes of John Fraser at Dovetail in New York and Chicago's prolific chef-restaurateur Paul Kahan at Avec, Blackbird, Nico Osteria and Publican Quality Meats. Like other so-called boomerangs, Bradley took what she learned toiling in the kitchens of big-city, Michelin-starred restaurants and poured that knowledge and experience into her own business back home, in the far western reaches of Kentucky.

The result was Freight House, a dinner-only eatery housed in an old vegetable depot. The pine rafters, brick walls and exposed ductwork make a lofty setting for the 140-seat restaurant, where the corner bar is stocked with more than 300 bourbons, whiskeys and ryes. The creative menu focuses on fresh, seasonal ingredients all sourced within a day's drive of Paducah (pah-DOO-kah), an artsy, riverfront town of 25,000, just below the southern tip of Illinois.... "I really wanted to be on ('Top Chef') to showcase my end of the state," Bradley said, throwing a tiny bit of shade in the direction of Louisville and Lexington. "Western Kentucky sometimes doesn't get the love that central Kentucky does." One of the most popular dishes at Freight House is Kentucky silver carp, a.k.a.Asian carp, an invasive species that Bradley is proud to serve, both from an environmental and a gastronomic standpoint. She gussies up the mild white fish with stewed sweet tomatoes, lima beans, cornbread croutons and fresh herbs ($21). Five bucks will get you a bowl of addictively crunchy pork rinds

**Text from Chicago Tribune:**

When former Chicago chef Sara Bradley heard 'Top Chef' would be filming i ts n ew s eason i n her native Kentucky, she wanted a piece of the action.

Bradley, a tireless champion of Kentucky cuisine, got what she wanted. The 36-year-old chef is the sole contestant from the Bluegrass State, one of 15 competitors duking it out on Season 16 of television's Emmy Award-winning cooking competition, debuting Dec. 6 on Bravo. "I wanted to represent the energy and the culture that's happening in the food scene in Kentucky right now," said Bradley, who opened Freight House, her acclaimed farm-to-table restaurant, in Paducah, Ky., three years ago.

Before launching Freight House, Bradley honed her skills working for the likes of John Fraser at Dovetail in New York and Chicago's prolific chef-restaurateur Paul Kahan at Avec, Blackbird, Nico Osteria and Publican Quality Meats. Like other so-called boomerangs, Bradley took what she learned toiling in the kitchens of big-city, Michelin-starred restaurants and poured that knowledge and experience into her own business back home, in the far western reaches of Kentucky. The result is Freight House, a dinner-only eatery housed in an old vegetable depot. The pine rafters, brick walls and exposed ductwork make a lofty setting for the 140-seat restaurant, where the corner bar is stocked with more than 300 bourbons, whiskeys and ryes. The creative menu focuses on fresh, seasonal ingredients all sourced within a day's drive of Paducah (pah-DOO-kah), an artsy, riverfront town of 25,000, just below the southern tip of Illinois. "I really wanted to be on ('Top Chef') to showcase my end of the state," Bradley said, throwing a tiny bit of shade in the direction of Louisville and Lexington. "Western Kentucky sometimes doesn't get the love that central Kentucky does." One of the most popular dishes at Freight House is Kentucky silver carp, aka Asian carp, an invasive species that Bradley is proud to serve, both from an environmental and a gastronomic standpoint. She gussies up the mild white fish with stewed sweet tomatoes, lima beans, cornbread croutons and fresh herbs ($21). Five bucks will get you a bowl of addictively crunchy pork rinds begging to take a bath in the accompanying lemon-thyme aioli. Other starters include sinfully

---

[66] Lori Rackl, *Former Chicago chef Sara Bradley competes on 'Top Chef' in Kentucky where her Paducah restaurant is worth a trip*, Chicago Tribune (Oct. 18, 2018), https://www.chicagotribune.com/2018/10/18/former-chicago-chef-sara-bradley-competes-on-top-chef-in-kentucky-where-her-paducah-restaurant-is-worth-the-trip/.

This article is registered with the U.S. Copyright Office as part of Registration No. TX0008667980.

### (iii)    Perplexity's Personal AI Assistants

74.    Perplexity's Comet browser, which Perplexity markets as "[y]our personal assistant,"[67] will produce detailed and substitutive summaries of the Chicago Tribune's paywalled content to users who are not subscribed to the Chicago Tribune. In the example below, Perplexity's Comet browser returned and produced a detail summary of the paywalled Chicago Tribune article titled "Chicago's capacity limits for Christkindlmarket are a terrible idea. Here's why this issue matters."[68] The first image is what is displayed to non-subscribers when they attempt to view the article on chicagotribune.com. The second image is what Perplexity's Comet browser provides when asked to summarize the same paywalled article.



---

[67] Perplexity, *supra* note 9.

[68] The Editorial Board, *Editorial: Chicago's capacity limits for Christkindlmarket are a terrible idea. Here's why this issue matters*, Chicago Tribune (Dec. 1, 2025), https://www.chicagotribune.com/2025/12/01/editorial-christkindlmarket-daley-plaza-brandon-johnson-christmas-holidays-economy/.

> Please provide a detailed summary of this article
>
> Reviewed 1 source ›
>
> The editorial argues that Mayor Brandon Johnson's new crowd-cap limits on Chicago's Christkindlmarket at Daley Plaza are unnecessary, economically harmful, and emblematic of a broader disregard for downtown business and tourism, and it urges the city to move and expand the market, likely to Millennium Park, in future years. `chicagotribune`
>
> **New capacity limits and impact**
>
> The city imposed a 1,553-person cap on the market at any one time, less than half the COVID-era limit of 3,494, which vendors say has sharply reduced sales and made some question returning in future years. The board describes the cap as a "solution in search of a problem," noting that Christkindlmarket has long functioned safely and happily with crowds of 4,000 or more and that holiday crowds are part of the event's appeal. `chicagotribune`
>
> **Critique of city handling**
>
> The limits were applied with no advance notice to vendors or visitors, which the editorial interprets as further evidence of the Johnson administration's indifference to Loop businesses, tourists, and the city's broader economic needs. The cap has created long, cold lines outside the market, which the board says do more to ruin visitors' holiday experiences than to protect anyone. `chicagotribune`
>
> **Economic and cultural importance**
>
> The editorial stresses that Christmas markets are major economic engines in many European cities, drawing tourists, filling hotels, and shaping the December economy, and argues that Chicago should treat Christkindlmarket with similar seriousness. With traditional department store window displays diminished, the board says the market has become even more central to Chicago's holiday identity and downtown economy, and vendors should not have profits "summarily reduced" by bureaucratic decisions. `chicagotribune`
>
> **City response and remaining concerns**
>
> After the editorial first ran online, the city raised the cap by 1,000 people, but vendors and the editorial board still consider the change inadequate and remain frustrated. The situation is portrayed as symptomatic of repeated missteps by the Department of Cultural Affairs and Special Events, which the board argues should prioritize large, city-defining events like Christkindlmarket because of their economic impact, visible even ↓ residents' property tax bills. `chicagotribune`

75.     None of the Chicago Tribune's content returned and summarized in the output provided above is available to users who are not subscribed to the Chicago Tribune. As described above, these infringing outputs would not be possible without Perplexity accessing and copying Chicago Tribune content and using it as input in Perplexity's RAG process.

(iv)    Perplexity's Search API

76.     Perplexity's "AI-First" Search API will produce verbatim copies—often of an entire article from the Chicago Tribune—in response to search queries from users. In the example below, Perplexity's Search API outputs a verbatim copy of the Chicago Tribune article titled "How did Terrance Jenkins die? Guards, prisoners, disagree on details in inmate's death"[69] in response to a query that includes the title of that article.



---

[69] Steve Mills, *How did Terrance Jenkins die? Guards, prisoners, disagree on details in inmate's death*, Chicago Tribune (July 17, 2017), https://www.chicagotribune.com/2017/07/17/how-did-terrance-jenkins-die-guards-prisoners-disagree-on-details-in-inmates-death/.

```
  {
"results": [
        {
         "title": "How did Terrance Jenkins Die?",
         "url": "https://www.loevy.com/news/terrance-jenkins-die/",
         "snippet":     "By    Steve    Mills\n\nOriginally    published
```
http://www.chicagotribune.com/news/local/breaking/ct-pontiac-inmate-death-20170717-story.html\n\nIn the moments after a confrontation with prison guards left inmate Terrance Jenkins unresponsive, the paramedics trying to save his life made a troubling discovery: five small, crumpled balls of what looked like notebook paper lodged in his throat, blocking his airway.... Months later, State Police submitted a nearly 400-page report to prosecutors in Livingston County, where the prison is located. Among the documents: an autopsy report that found Jenkins died from a blocked airway and compression asphyxiation from the way the guards had restrained him — putting their weight on his body as his hands were cuffed behind his back and his feet were shackled.... Guards, for instance, were not pressed to explain how the balls of paper got into Jenkins' throat, nor were they pushed to say what happened to a rag or tissue Jenkins tried to bring from his cell to the recreation yard — the incident that supposedly violated rules and touched off the confrontation.... Illinois Department of Corrections officials declined to comment, saying that they could not discuss the case because the department was conducting its own investigation of Jenkins' death.\n\nState Police, meanwhile, declined to comment, citing a pending lawsuit that Jenkins' ex-wife and son — both of whom were estranged from the inmate — filed in federal court. That lawsuit, filed last year, alleges that the guards caused Jenkins' death by "shoving" paper down his throat when he was restrained.... "There was no interest in holding the guards accountable."\n\nOne official involved in the case offered an explanation for what happened to Jenkins. Danny Watson, who at the time of Jenkins' death was the deputy coroner and now is the county's elected coroner, said he believed Jenkins stuffed the balls of paper in his mouth himself. He said he based his explanation on a conversation with two guards, one of whom rode to the hospital in the ambulance carrying Jenkins, the other who followed the ambulance.... Inmates do, in fact, have access to notebook paper. But the two guards Watson described arrived on the scene at the prison after Jenkins was already restrained, the reports show, so they could not have seen Jenkins swallow the paper himself — even if that had occurred. In addition, the guards do not claim in interviews with State Police that Jenkins had tried to swallow the paper.... Nor does any other guard interviewed in the investigation.\n\n**Life in prison**\n\nBy the time Jenkins died, he had spent much of his life entangled in the criminal justice system.\n\nHis criminal record began at age 11, when he was convicted in juvenile court of riding in a stolen car. Because of his "uncontrollable behavior" and frequent run-ins with the law, court records show, Jenkins was in and out of the state's youth prisons. After one release, he stabbed a boy in the back.... Jenkins' prison file suggests the assignment was because of at least one incident in which he was assaulted by another inmate, as well as gang threats. One 2006 prison document says an inmate threw hot water and baby oil on Jenkins, and that Jenkins had refused demands

41

from other inmates to attack a prison staffer — the kinds of incidents that could make an inmate especially vulnerable.... **Diverging Accounts**\nOn Oct. 4, 2015, about 12:30 p.m., a group of inmates was being walked from their cells to the yard, where they often lifted weights or played basketball, or sat on benches and played cards, dominoes or board games. The guards patted them down near the doorway before they were allowed outside.... Jenkins, according to the guard who searched him, was carrying a white rag or a washcloth, although some inmates said he merely had tissue or toilet paper to dab his eyes, which leaked because of his glaucoma. Either way, the guards considered what he had contraband, something inmates are not allowed to have.... According to guards, Jenkins was told to return to his cell but refused. Officer Adam Deal told Jenkins to "cuff up" — to allow himself to be handcuffed. Jenkins allegedly disobeyed that order as well. Instead, he turned, squared up and took what the guards called a fighting stance, with his fists raised, according to the guards.... Jenkins moved up the stairs of the cellhouse. Confronted by Deal, he punched the officer in the nose, according to guards. A lieutenant, James Boland, used a pepper spray on Jenkins twice, although it seemed to have little effect on him, and he allegedly flailed his arms and kicked the guards.... A prisonwide emergency call was made, and guards responded. They cuffed Jenkins' hands behind his back and worked to shackle his feet, though Jenkins allegedly continued to resist.\n\nDeal said Jenkins was "yelling, screaming and cussing" and would not follow orders to stop.\n\nAt one point, the guards had Jenkins in a small room near the doorway to the yard as they tried to bring him under control. When a high-ranking officer arrived on the scene, he asked the guards what had started the incident.... "This guy punched Deal," one officer said, according to the interviews.\n\nInmates told a different story. They said that tensions between guards and inmates had been building of late, in part because guards often were arbitrary in how they treated them. Guards were especially angry on that day, inmates said, because a cellhouse broom had gone missing.... That day, Boland — who some inmates said treated them rudely — used crude language to tell Jenkins to take the toilet paper back to his cell, the inmates said. Jenkins, who was known as Prince and was described by some inmates as outspoken, told Boland not to treat him like a child. Nonetheless, several inmates said, Jenkins began walking to his cell, though he kept talking as he went.... "The whole point is that Inmate Jenkins was following orders already. The lieutenant told him to go back to the cellhouse. He went," said Jose Jimenez, serving a 22-year term for murder.\n\nRayshawn Hudgins, a former Chicago Housing Authority police officer serving time for sexually assaulting young men, said Boland and Deal frequently antagonized inmates.... When the guards tried to subdue Jenkins, some prisoners said at least one guard had an arm around Jenkins' throat, using a chokehold, while others were on his back. Other inmates said guards punched and kicked Jenkins during the confrontation, which by all accounts lasted several minutes.\n\nNone of the guards said Jenkins was punched or kicked, according to the State Police reports.... One inmate told the State Police he heard a guard ask Boland afterward if he held back during the incident.\n\nBoland, according to the inmate, replied: "No, I don't hold back. I went full throttle."\n\nNone of the guards reported hearing that conversation.\n\nAt least one inmate said he heard Jenkins scream, "I can't

breathe."... During the struggle, Jenkins became unresponsive. At that point, guards tried to revive him, with one guard performing chest compressions and another trying to restore his breathing. He was then put on a gurney — facedown, his hands and feet still cuffed — and taken to the prison infirmary.\n\n**'Breathed shadiness'**... Efforts to save Jenkins' life continued in the infirmary, though guards were doing much of the work. One nurse said she saw some tiny pieces of paper around Jenkins' mouth, and the prison's doctor said he did, too. Both suspected they were from guard Derrick Caudle's mouth-to-mouth shield, a device that serves as a barrier between a person performing mouth-to-mouth and the person receiving it.... Fairley said that Jenkins was "technically" dead when they arrived at St. James. Nonetheless, doctors tried for about 10 minutes to revive him; they continued CPR, and gave him repeated doses of epinephrine to try to start his heart, all to no avail. A doctor pronounced Jenkins dead at 1:35 p.m., about an hour after the episode at the prison.... Agents returned to the prison five days later and interviewed several dozen inmates, but said in their reports that only 16 of the inmates had any useful information about what led to Jenkins' death.... Jackson told State Police that a number of guards were on top of Jenkins. Asked if Jenkins was cooperating or resisting, he said "a little bit of both." He said that, at one point, the guards picked up Jenkins and took him to a room where Jackson and other inmates could not see them.\n\nBut the guards, in their interviews, said Boland and Deal were professional with the inmates.... "I would say he's by the book … as far as keeping those guys under control," one guard said of Deal. And Boland told the State Police that the "inmates are always wanting to fight, it seems."\n\nAlthough the interviews with the guards and the inmates offer dramatically opposing accounts of the confrontation with Jenkins, they nonetheless seem revealing — at least about the investigation.... State Police showed a measure of deference to the guards. They were skeptical of inmates' accounts, and they even seemed to brush off some information the inmates offered. Agents apparently never re-interviewed guards about the information they gathered from their interviews with inmates.\n\nAs a result, the guards were not asked about the missing broom some inmates said had stoked tensions the day Jenkins died, or if they had changed rules on what inmates could bring to the yard.... He said he took notes from his conversation with the guards, but threw them away.\n\nAlthough the Department of Corrections said it is conducting its own investigation of Jenkins' death, it is possible that no explanation will be found for how he died with balls of paper blocking his airway.\n\nIndeed, State Police asked one guard if anyone was trying to cover up what happened.\n"We're in a prison," the guard said. "(Expletive) happens.""",

This article is registered with the U.S. Copyright Office as part of Registration No. TX0008473142.

***

43

77.    The underlying, original content cited above reflects the substantial resources the Chicago Tribune devotes to publish trusted, first-hand reporting. A service that requires human reporting and investigative work and cannot be supplanted by AI. For example, in the article cited above regarding taxpayer-funded living centers, the Chicago Tribune exposed the mistreatment of vulnerable children. The article not only details reports of abuse submitted to the state but includes statements from children who were themselves victims. This reporting would not be possible without investment by the Chicago Tribune in its journalists and reporting. The ability of the Chicago Tribune to continue to produce important works, like those cited above, is jeopardized by Perplexity's unlawful actions.

78.    These examples of verbatim or otherwise substantially similar or substitutive outputs create a reasonable inference that Perplexity is generating massive amounts of such outputs in response to users' prompts, from all or virtually all of the Chicago Tribune's valuable, copyrighted works. Those prompts and outputs are in the sole possession, custody, and control of Perplexity.

## IV.    Perplexity Engages in Trademark Infringement by Falsely Attributing "Hallucinations" to the Chicago Tribune

79.    When Perplexity's website and app are asked questions that relate to Chicago Tribune's publications, the applications will often misrepresent Chicago Tribune's works, falsely attributing content to Chicago Tribune's trademarked publications and content or misleadingly omitting portions of Chicago Tribune's trademarked publications which infringes Chicago Tribune's trademark.

80.    Perplexity has touted that it is less likely to generate fabricated text or "hallucinations" than other generative AI products on the market. According to Mr. Srinivas, Perplexity's "tenet" of citing sources also contributes to a reduction in hallucinations. When asked

how Perplexity "prevent[s] or cut[s] down on hallucinations," Mr. Srinivas responded, "The core tenet of the product is, only say what you can cite. That's also a principle in academia or journalism, like you need to have sources. So, if you're only going to pull up content from a link or a webpage, and only use that content for writing the answer, you can reduce hallucinations a lot."[70]

81.     But Perplexity often generates hallucinations in its outputs and mis-attributes that inaccurate text to the Chicago Tribune. Perplexity's use of the Chicago Tribune's mark alongside hallucinations is likely to cause dilution by blurring and/or tarnishing of the Chicago Tribune's famous mark and causes serious damage to its worldwide reputation for truth and accuracy in reporting. Perplexity's use of the Chicago Tribune's trademark alongside hallucinations is a commercial transaction that is likely to divert traffic, sales and subscriptions from the Chicago Tribune, which commercially harms the Chicago Tribune. In addition, Perplexity's use of this mark alongside hallucinations constitutes false designations of origin and confuses and deceives Perplexity users into believing (falsely) that the hallucinations are associated with, sponsored by, or approved by the Chicago Tribune. This false belief, induced by Perplexity, unjustly enriches Perplexity and causes significant harm to the Chicago Tribune.

82.     For example, in the example provided below, Perplexity provided a hallucinated output falsely attributing the verbatim text from an article published by another news outlet to the Chicago Tribune.

[example follows on next page]

---

[70] Outset Capital, *supra* note 36, at 19:22-19:47.



## What are the first three paragraphs

The first three paragraphs from the Chicago Tribune article about the settlement money Kenneka Jenkins' family received are:

1. Kenneka Jenkins was found dead inside a walk-in freezer at the Crowne Plaza Chicago O'Hare Hotel in Rosemont early on September 10, 2017, after she went to the complex late on September 8 for a private party in a room there.

2. Her mother filed a wrongful death lawsuit against the hotel's parent company, security firm, and restaurant, claiming staff were negligent because they didn't secure the walk-in freezer or conduct a proper search when Jenkins went missing. A settlement agreement was reached in August, according to court records, but terms of the deal were not made public until Tuesday, when the case had been scheduled to go to trial.

3. The settlement totals $10 million, with more than $3.5 million going to the family's attorneys, more than $6,000 going towards her funeral costs, and more than $6.4 million to be split between Jenkins' mother and two other relatives. Jenkins' mother, Tereasa Martin, will get more than $3.7 million, while two other relatives will get $1.5 million and $1.2 million. cbsnews

10 sources

83.     Despite Perplexity's attribution of the output text to the Chicago Tribune, the verbatim text above is from an article published by CBS News.[71]

**V.      The Chicago Tribune Suffers Harm from Perplexity's Illegal Conduct**

84.     By copying the Chicago Tribune's copyrighted content and using it to create substitutive output derived from its works, obviating the need for users to visit the Chicago Tribune's website or purchase its newspaper, Perplexity is misappropriating substantial subscription, advertising, licensing, and affiliate revenue opportunities that belong rightfully and exclusively to the Chicago Tribune.

---

[71] Todd Feurer, *Kenneka Jenkins' family to get $6.4 million in settlement over her death in Chicago area hotel freezer*, CBS Chicago (Dec. 12, 2023), https://www.cbsnews.com/chicago/news/kenneka-jenkins-freezer-death-settlement/.

85. Perplexity's latest valuation at $20 billion and success at raising funds of nearly $1.5 billion[72] are indicative of the potentially massive illegal transfer of economic value from original content creators like the Chicago Tribune to Perplexity. Indeed, according to a news report, in 2024, Perplexity spent $48M on cloud services, paid $19M for talent, and paid $8M to Anthropic and OpenAI to use their models yet paid the Chicago Tribune nothing for using the Chicago Tribune's content to power its products.[73]

86. In addition to this massive misappropriation of revenue, when outputs from Perplexity's GenAI Products contain hallucinations attributed to the Chicago Tribune via its trademark or misleading excerpts in reproductions of the Chicago Tribune's content, the Chicago Tribune is further harmed by false attributions and dilution. Perplexity's hallucinations, passed off as the Chicago Tribune's high-quality, meticulously researched, and trusted content (using Chicago Tribune's trademark), damage the value of the Chicago Tribune's trademark and hard-earned reputation. Likewise, Perplexity's misleading excerpts, passed off as the complete versions of the Chicago Tribune's high-quality, meticulously researched, and trusted content (using Chicago Tribune's trademark), damage the value of the Chicago Tribune's trademark. The hallucinations and undisclosed omissions also cause harm to the public.

87. Perplexity has admitted by its own actions, including its "Publishers' Program" and licensing deals with certain publishers, that there is a market for licensing copyrighted works for AI purposes. Perplexity has stated that one key component of its Publishers Program is "revenue sharing": "When Perplexity earns revenue from an interaction where a publisher's content is

[72] Rebecca Torrence, Charles Rollet, and Ben Bergman, *AI startup Perplexity is raising more money at a $20 billion valuation*, Business Insider (Aug. 13, 2025), https://www.businessinsider.com/perplexity-valuation-jumps-to-20-billion-in-latest-fundraise-2025-8.

[73] Sri Muppidi, *For Google Challenger Perplexity, Growth Comes at a High Cost*, The Information (May 19, 2025), https://www.theinformation.com/articles/google-challenger-perplexity-growth-comes-high-cost?rc=lvqcdt.

referenced, that publisher will also earn a share."[74] Although Perplexity has been quick to emphasize that other tech companies have not engaged in revenue-sharing,[75] Perplexity is free riding on the Chicago Tribune's journalism—as well as the journalism of many other news organizations.

88.     Perplexity has willfully chosen to operate without such licenses and to scrape copyrighted content with impunity even when expressly asked by the copyright owner not to do so. The Chicago Tribune is directly injured by Perplexity's theft of its works, which serves to devalue the Chicago Tribune and deprive it of immediate and potential subscription, advertising, licensing and affiliate revenue. For example, one published study has concluded that "AI bots on average are sending 95.7% less referral traffic than traditional Google search."[76]

89.     Perplexity's unlawful conduct also harms the public by eroding the economic incentives necessary for the creation and publication of trustworthy, informative content. In the long term, if the intellectual property rights of the Chicago Tribune and other publishers are not respected and enforced, creators will not be able to generate high-quality content because they will not receive a sufficient return on investment. Diminished content will further result in reduced revenue, and thus less spending on content creation, spawning even less content of even poorer quality and even less revenue, and so on in a downward spiral for creators like the Chicago Tribune. In this way, Perplexity imperils the very market for the high-quality content that it copies and reproduces, and upon which its entire business depends.

---

[74] Perplexity Team, *Introducing the Perplexity Publishers' Program* (July 30, 2024), https://www.perplexity.ai/hub/blog/introducing-the-perplexity-publishers-program.

[75] Harvard Business School, *supra* note 43, at 27:02-27:20 (Srinivas: "We're also having a publisher program, where we share revenue made on a query with the publishers. And, by the way, this is something Google never did. They make a lot of ad revenue. They tell publishers, we're giving you traffic. But they don't share the ad revenue with the publishers.").

[76] Tollbit, *AI Scraping is on the Rise, Tollbit State of the Bots – Q4 2024* (Feb. 24, 2025), https://tollbit.com/bots/24q4/.

**COUNT I**
**Copyright Infringement (17 U.S.C. § 106(1)) – Perplexity's Acquisition of the Chicago Tribune's Copyrighted Works to Create "Inputs" for its GenAI Products**

90.     The Chicago Tribune restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

91.     The Chicago Tribune holds exclusive rights to the extensive body of copyrighted material it seeks to protect in this case.

92.     This includes copyrights registered with the U.S. Copyright Office, including the registrations attached in a summary chart as Exhibit A.  It also includes all Chicago Tribune copyrights registrations that have been filed subsequent to the last registration listed on Exhibit A.

93.     Upon information and belief, Perplexity, without the Chicago Tribune's authorization, directly or indirectly through third parties, has willfully copied as many of the Chicago Tribune's articles and content that it has been able to access with its own or with third parties' web crawlers as inputs into database(s) or index(es). These inputs include content covered by the registrations listed at Exhibit A.

94.     This database(s) or index(es) are used for a process commonly referred to as retrieval-augmented generation or "RAG."

95.     The copies that are made as inputs into Perplexity's AI product, which may be retained in Perplexity's RAG database(s) or index(es), are distinct copyright violations on a massive scale.

96.     Perplexity's massive and ongoing infringements violate the Copyright Act, 17 U.S.C. § 106(1).

97.     Perplexity's infringements are ongoing, and the Chicago Tribune is entitled to injunctive relief and other equitable remedies.

49

98.    The Chicago Tribune is also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

**COUNT II**
**Copyright Infringement (17 U.S.C. § 106(2)) – Perplexity's Copying of the Chicago Tribune's Copyrighted Works to Create "Outputs" to User Queries**

99.    The Chicago Tribune restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

100.    The Chicago Tribune holds exclusive rights to the extensive body of copyrighted material it seeks to protect in this case.

101.    This includes copyrights with the U.S. Copyright Office, including the registrations attached in a summary chart as Exhibit A.

102.    Upon information and belief, Perplexity, without the Chicago Tribune's authorization, directly or indirectly through a third party, has willfully copied as many of the Chicago Tribune's articles and content that it has been able to access with its own or with third parties' web crawlers as inputs into database(s) or index(es), including content covered by the registrations listed at Exhibit A.

103.    This database(s) or index(es) are used for a process commonly referred to as retrieval-augmented generation or "RAG."

104.    Perplexity, in turn, uses the Chicago Tribune's copyrighted content, accessed through its RAG process, to produce outputs, or "answers" to user queries.

105.    The outputs or "answers" to user queries contain and/or are derived from the Chicago Tribune's copyrighted content, whether they come in the form of verbatim or near-verbatim reproductions, summaries, or abridgements of the Chicago Tribune's copyrighted works, or any other reproduced or derivative content sourced from the Chicago Tribune's copyrighted

works—all of which infringe on the Chicago Tribune's copyrighted articles.

106. As Perplexity has publicly stated, these outputs are designed to eliminate the need for its users to visit the original content creators' websites.

107. Every instance in which Perplexity, on its own or by directing or controlling a third party, copies the Chicago Tribune's copyrighted work in the process of generating outputs or "answers," constitutes a separate violation of the Copyright Act, 17 U.S.C. § 106(2).

108. Perplexity's infringements are ongoing, and the Chicago Tribune is entitled to injunctive relief and other equitable remedies.

109. The Chicago Tribune is also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT III
### Contributory and Vicarious Copyright Infringement

110. The Chicago Tribune restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

111. In the alternative, to the extent that Perplexity argues that an end-user—rather than Perplexity—should be liable as a direct infringer based on Perplexity outputs, Perplexity is secondarily liable for unlawfully reproducing, displaying, distributing, and preparing derivatives of the Chicago Tribune's copyrighted works under each of three theories: contributory infringement by material contribution, contributory infringement by inducement, and vicarious infringement.

112. Perplexity, without the Chicago Tribune's permission or consent, has unlawfully reproduced, distributed to the public, publicly displayed, and prepared derivative works based upon the Chicago Tribune's content. Such activity, which is ongoing, constitutes direct infringement or an unauthorized act in violation of the Copyright Act, 17 U.S.C. §§ 106(1)–(3),

51

(5) and 501.

113.    Perplexity knows that its RAG process responds to users with outputs that infringe the Chicago Tribune's works. Perplexity materially contributes to such infringement by providing a RAG process designed to foster the infringement of the Chicago Tribune's copyrighted works and transmit those infringing copies to users via its answer engine. Perplexity provides the site and facilities for its users' ongoing infringement. Perplexity has the means to prevent such material contribution but does not do so. Instead, it intentionally avoids taking steps to sufficiently mitigate its infringement.

114.    Perplexity also intentionally induces its users' infringing activity. Perplexity designs, operates, and maintains its RAG process with the object of supplying the Chicago Tribune's content, including full verbatim or substantially similar copies. Perplexity promotes itself as a service providing such content, inducing its users' direct infringement. As a direct and proximate result of such actions, Perplexity has infringed the Chicago Tribune's copyrighted content.

115.    Perplexity is also vicariously liable for these infringements by licensees. Perplexity has the legal right and practical ability to supervise and control the infringing activities that occur through and as a result of its RAG process. Perplexity has refused to take reasonable steps to prevent the infringement by users and licensees of its RAG process, including by ignoring or evading technological features, such as robots.txt, designed specifically to guard against Perplexity's copying of the Chicago Tribune's works. As a direct and proximate result of such refusal, Perplexity has infringed the Chicago Tribune's copyrights.

116.    Additionally, Perplexity receives a direct financial benefit from the infringing activity. First, Perplexity draws users, licensees, and potential licensees to its products by claiming

52

its "answers" "Skip the links" by providing "a single, comprehensive answer that summarizes everything you need to know." In his public statements, Perplexity's CEO has similarly emphasized Perplexity's ability to provide users, licensees, and potential licensees comprehensive responses based on high-quality news content, such as that from The New York Times. Second, by providing outputs containing high-quality news content, like that of The New York Times, Perplexity encourages users to become paid licensees. And a licensee is more likely to remain one (or select a higher-priced plan) if the licensee continues to obtain the same high-quality news content.

## COUNT IV
### False Designation of Origin and Dilution of the Chicago Tribune's Trademark
### (15 U.S.C. § 1125)

117.   The Chicago Tribune restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

118.   The Chicago Tribune is the owner of the federally registered trademark Reg. No. 771,167 for the name "Chicago Tribune," referenced in Exhibit B (the "Chicago Tribune Mark"). The Chicago Tribune has used, and continues to use, the Chicago Tribune Mark on its products and publications, including the chicagotribune.com website, as well as other websites and publications.

119.   The Chicago Tribune Mark is distinctive and famous.

120.   The Chicago Tribune Mark is a distinctive and "famous mark" within the meaning of Section 43(c) of the Lanham Act, is widely recognized by the general consuming public of the United States, and became distinctive and famous prior to Perplexity's unauthorized use.

121.   The Chicago Tribune Mark is incontestable due to the Chicago Tribune's registration and continued use of this mark.

122.    Defendant's unauthorized use of the Chicago Tribune Mark in interstate commerce on lower quality and inaccurate writing dilutes the quality of the Chicago Tribune Mark by tarnishment in violation of 15 U.S.C § 1125(c).

123.    When Perplexity's website and app are asked questions that relate to the Chicago Tribune's publications, the applications will often misrepresent the Chicago Tribune's work, falsely attributing content to the Chicago Tribune's trademarked publications and content or misleadingly omitting portions of the Chicago Tribune's trademarked publications.  Perplexity's actions are a commercial transaction.

124.    Upon information and belief, Perplexity is aware that its applications falsely attribute content to the Chicago Tribune's trademarked publications and content. Upon information and belief, Perplexity is also aware that its applications misleadingly omit portions of the Chicago Tribune's publications and falsely suggest that its incomplete reproductions constitute the entirety of the Chicago Tribune's publications.

125.    Perplexity has used and, upon information and belief, continues to use in interstate commerce "Chicago Tribune" and marks similar and/or identical to the Chicago Tribune Mark in a misleading manner, falsely attributing content to the Chicago Tribune's trademarked publications and content.

126.    Perplexity's use of similar and/or identical copies of the Chicago Tribune Mark without authorization, in connection with its GenAI Products, creates an association in the minds of its users that the outputs generated by Perplexity's GenAI Products, including hallucinations and undisclosed omissions, are derived from, associated with, and/or complete version of sources of high-quality content. This association, in turn, impairs the distinctiveness of the marks.

127.    Perplexity's actions also violate 15 U.S.C. § 1125(c) because they are likely to

54

cause dilution of the Chicago Tribune's famous and distinctive marks by blurring and/or tarnishment.

128.    Perplexity's actions violate 15 U.S.C. § 1125(a)(1) because they trade upon Chicago Tribune's valuable reputation and consumer goodwill by using the Chicago Tribune Mark and/or confusingly similar marks in a manner that causes and/or is likely to cause confusion, mistake, or deception of consumers into believing that Chicago Tribune outputs are factually correct, complete, and authoritative because they are sourced from, associated with, sponsored by, or approved by the Chicago Tribune.

129.    Upon information and belief, Perplexity has actual knowledge of the Chicago Tribune's ownership and use of its logo trademark. Perplexity's use of the trademark without the consent of the Chicago Tribune constitutes a willful violation of 15 U.S.C. § 1125.

130.    Perplexity's infringements are ongoing, and the Chicago Tribune is entitled to injunctive relief and other equitable remedies.

131.    The Chicago Tribune is also entitled to statutory damages, actual damages, treble damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT V
## Trademark Infringement (15 U.S.C. § 1114)

132.    The Chicago Tribune restates and incorporates by reference its allegations set forth in the preceding paragraphs.

133.    Perplexity makes unauthorized and willful use of the Chicago Tribune's federally registered trademark, including in connection with the sale, distribution, and advertising of its services. Perplexity uses marks in commerce that are either identical to, variations of, or colorable imitations of the Chicago Tribune's federally registered trademark in connection with the generation and distribution of hallucinated articles that the Chicago Tribune did not publish.

134.    Perplexity's use infringes the Chicago Tribune's exclusive rights in its federally registered trademark, and has caused and is likely to cause confusion, mistake, or deception as to whether the hallucinated articles Perplexity provides are associated or affiliated with, or are sponsored, endorsed, or approved by the Chicago Tribune. Perplexity's use is intended to reap the benefit of consumers' trust in the Chicago Tribune. Perplexity intentionally, willfully, and deliberately uses the Chicago Tribune's federally registered mark despite Perplexity's knowledge that it has no right, license, or authority to use this mark or any confusingly similar variation of this mark.

135.    Perplexity's infringements are ongoing, and Chicago Tribune is entitled to injunctive relief and other equitable remedies.

136.    Chicago Tribune is also entitled to statutory damages, actual damages, treble damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Perplexity as follows:

a.    Awarding Plaintiff statutory damages, actual damages, treble damages, restitution of profits, and any other relief that may be permitted by law or equity;

b.    Permanently enjoining Perplexity from engaging in the unlawful conduct alleged herein;

c.    Awarding Plaintiff costs, expenses, and attorneys' fees as permitted by law; and

d.    Awarding Plaintiff such other or further relief as the Court may deem just.

**DEMAND FOR JURY TRIAL**

The Chicago Tribune hereby demands a jury trial for all claims so triable.


Dated: March 20, 2026                    By: /s/ *Steven Lieberman*

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Robert Parker *(pro hac vice forthcoming)*
Jenny L. Colgate *(pro hac vice forthcoming)*
Kristen J. Logan *(pro hac vice forthcoming)*
Bryan B. Thompson (6004147)
Alexandra Hughes (*admitted pro hac vice*)
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
rparker@rothwellfigg.com
jcolgate@rothwellfigg.com
klogan@rothwellfigg.com
bthompson@rothwellfigg.com
ahughes@rothwellfigg.com

*Attorneys for Plaintiff*

57