# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No.  25-cv-06213-EKL<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 34, 54 |

This copyright infringement action arises out of allegations that Defendant Meta Platforms, Inc. used BitTorrent to download films owned by Plaintiffs Strike 3 Holdings, LLC and Counterlife Media, LLC to train generative artificial intelligence ("AI") models.  Before the Court is Defendant's motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Mot. to Dismiss, ECF No. 34 ("Mot.").  The Court carefully reviewed the parties' briefs and heard argument on February 11, 2026.  ECF No. 42.  For the following reasons, the Court DENIES Defendant's motion.

## I.      BACKGROUND

Plaintiffs are the owners of adult films.  Compl. ¶ 2, ECF No. 1.  Plaintiffs allege that Defendant is infringing their copyrighted works by downloading and uploading their films using BitTorrent.  *Id.* ¶ 5.  BitTorrent is a file-sharing protocol designed to quickly distribute large files over the internet by allowing users to connect to other users' computers to "simultaneously download and upload pieces of [a] file from and to other users."  *Id.* ¶ 61.  BitTorrent operates on a tit-for-tat basis where uploading files, known as "seeding," enables the user to obtain faster download speeds.  *See id.* ¶ 112.  Thus, Plaintiffs allege Defendant not only downloaded their films but also distributed them on BitTorrent "to accelerate its downloads of vast amounts of other

content." *Id.* ¶¶ 111, 116, 119.

Around January 2025, Plaintiffs became aware that Defendant "admitted to using . . . pirated books it obtained through BitTorrent to train its LLaMA platforms in a separate lawsuit." *Id.* ¶¶ 53-55 (referencing *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-3417 (N.D. Cal. filed on July 7, 2023)). Specifically, Defendant's "employees testified that Meta configured six Virtual Private Clouds . . . to torrent content." *Id.* ¶ 92. After learning about Defendant's admission in *Kadrey*, Plaintiffs conducted an investigation using proprietary copyright infringement detection tools and an archive of recorded infringement of their films. *Id.* ¶¶ 56, 71. Plaintiffs began by reviewing their archive and identified 47 IP addresses belonging to Defendant ("Corporate IP Addresses") that were used to torrent their films 157 times from 2018 to 2025. *Id.* ¶¶ 56, 77, 109-110; Compl. Ex. F, ECF No. 19-4.[1]

Plaintiffs then attempted to identify Defendant's "hidden IP addresses by looking for . . . correlations to data patterns that matched infringement patterns seen on Meta's corporate IP Addresses," such as when multiple IP addresses torrented files with the same key term in the file name on the same day. Compl. ¶ 94; *see also* Ex. B. Using this technique, Plaintiffs identified IP addresses in seven ranges ("IP Ranges A-G") and a Comcast residential IP address ("Residential IP Address") that appeared to "act[] in conjunction" with the Corporate IP Addresses. Compl. ¶ 97; *see also* Ex. B. Plaintiffs allege that the seemingly coordinated behavior across these IP addresses shows that IP Ranges A-G and the Residential IP Address were used by Defendant for a business purpose. Compl. ¶¶ 101-102. Specifically, Plaintiffs allege that: (1) Ranges A-F correspond with the six Virtual Private Clouds ("VPCs") identified in *Kadrey*, *id.* ¶ 98; (2) Range G belongs to VDS Corp., LLC, a Hawaiian non-profit registered to a street address that Plaintiffs were unable to locate and about whose "purported Director" Plaintiffs could not find "any public information," *id.* ¶ 99-100; and (3) the Residential IP Address belongs to the father of a man who worked for Defendant "on a contract basis . . . during the time of infringement with the title of 'automation engineer,'" that the infringement ceased when his contract ended, and that the

---

[1] All exhibits to the complaint are filed under ECF No. 19-4.

United States District Court
Northern District of California

contractor has since been rehired by Defendant at its Reality Labs in New York, *id.* ¶¶ 104-106.

All told, the IP addresses identified in the complaint allegedly torrented at least 2,396 of Plaintiffs' films a total of 6,008 times between 2018 and 2025. *Id.* ¶¶ 6, 108-109; Exs. E-F. Additionally, the IP addresses were allegedly used to seed Plaintiffs' films to BitTorrent, including the "continuous distribution of 1,335 of [their] movies for at least three full days after acquiring the full copy of the movie" from BitTorrent. Compl. ¶¶ 116, 119; Exs. G-H. Plaintiffs contend that this behavior demonstrates "non-human patterns," indicating that the torrenting was conducted by Defendant using "centrally driven . . . sophisticated algorithms and scripts." Compl. ¶¶ 101-102. Plaintiffs further allege that Defendant torrented their films for the purposes of "acquiring content to train its Meta Movie Gen, Large Language Model[,] [and] various other Meta AI Models that rely on video training content," which Defendant expects to generate between $460 billion and $1.4 trillion in total revenue by 2035. *Id.* ¶¶ 7, 126.

On July 23, 2025, Plaintiffs filed this complaint asserting causes of action for direct, vicarious, and contributory copyright infringement. *Id.* ¶¶ 156-175. Defendant moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To avoid dismissal, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When there are "two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* (citing *Twombly*, 550 U.S. at 554).

For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

## III. REQUEST FOR JUDICIAL NOTICE

In ruling on a motion to dismiss, courts generally do not consider material outside the pleadings. *United States v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011). However, courts may consider "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). Additionally, courts may take judicial notice of facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts may not, however, take notice of disputed facts contained in a judicially-noticed document. *See Khoja*, 899 F.3d at 999.

Defendant asks the Court to consider nine exhibits in connection with its motion to dismiss. Req. for Judicial Notice, ECF No. 35 ("RJN"); Decl. of Angela Dunning, ECF No. 34-1; Reply Decl. of Angela Dunning, ECF No. 39-1. Defendant's request is GRANTED as to Exhibits 1-2, 5-7, and 9. Defendant's request is DENIED as to Exhibits 3-4 and 8.

Exhibits 1 and 2 are Defendant's 10-K forms filed with the Securities and Exchange Commission ("SEC"). Dunning Decl., Exs. 1-2, ECF Nos. 34-2, 34-3. The Court may take judicial notice of these exhibits because they are publicly-available documents. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1066-67 (N.D. Cal. 2010). However, the Court considers SEC filings "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Troy Grp., Inc. v. Tilson*, 364

F. Supp. 2d 1149, 1152 (C.D. Cal. 2005). Thus, the Court will not consider Exhibits 1 and 2 for the purpose of determining the number of individuals Defendant employs. *See* RJN Opp. at 3-5, ECF No. 38. The Court notes, however, that Plaintiffs do not dispute that Defendant employs many people. *See id.* at 1.

Exhibit 3 is a research paper titled "Ego4D: Around the World in 3,000 Hours of Egocentric Video." Dunning Decl., Ex. 3, ECF No. 34-4; *see also* RJN at 5. The Court finds that it may not judicially notice Exhibit 3 because it is being introduced for the truth of its contents to rebut well-pleaded facts in the complaint and because, contrary to Defendant's assertion otherwise, its accuracy may reasonably be questioned. *See Khoja*, 899 F.3d at 999.

Exhibit 4 is Defendant's AI Terms of Service, as of July 1, 2025. Dunning Decl., Ex. 4, ECF No. 34-5. Plaintiffs oppose taking judicial notice of Exhibit 4, arguing that it is irrelevant because it concerns the conduct of Defendant's users, not its employees, and took effect only weeks before this lawsuit was filed. RJN Opp. at 8. Defendant replies that Plaintiffs' arguments may affect the weight of the evidence but are not reasons to deny judicial notice. RJN Reply at 3-4, ECF No. 40. Because the only purpose for which Defendant requests judicial notice is disputed, *see infra* n.6, the Court will not take judicial notice of Exhibit 4.

Exhibit 5 is a spreadsheet reflecting the information in Exhibit F to the complaint sorted chronologically. Dunning Decl., Ex. 5, ECF No. 34-6. Plaintiffs do not oppose this exhibit. *See* RJN Opp. The Court will incorporate Exhibit 5 by reference because it is comprised of the same information already attached to the complaint in Exhibit F.

Exhibits 6 and 7 are docket entries 568-9 and 490-37, respectively, which are exhibits to motions for summary judgment in the *Kadrey* litigation. Dunning Decl., Exs. 6-7, ECF Nos. 34-7, 34-8; Dunning Decl. ¶¶ 7-8. Exhibit 6 is an excerpt of email correspondence between two of Defendant's employees. Dunning Decl., Ex. 6. Exhibit 7 is a portion of the transcript of the Rule 30(b)(6) deposition of Defendant, by and through its corporate designee, Michael Clark, taken December 19, 2024, concerning the six VPCs. Dunning Decl., Ex. 7. Both exhibits are cited in the complaint, *see* Compl. ¶¶ 92, 107, and Plaintiffs do not oppose incorporation, *see* RJN Opp. Accordingly, the Court will incorporate both exhibits by reference.

Exhibit 8 is an article from July 25, 2024, titled "New Decision Addresses Meta's Rules on Non-Consensual Deepfake Intimate Images" by Meta's Oversight Board. Dunning Reply Decl., Ex. 8, ECF No. 39-2. Plaintiffs reference this article in their RJN opposition and Defendant requests that it be judicially noticed in an attachment to their RJN reply. *See* RJN Opp. at 9; Dunning Reply Decl. ¶ 2. The Court will not judicially notice Exhibit 8 because it is not properly introduced for purposes of deciding Defendant's motion to dismiss, and because it is being used for the truth of its contents, which may reasonably be disputed.

Exhibit 9 is a copy of Plaintiff Strike 3 Holdings, LLC's complaint against an unnamed subscriber of an IP address. Dunning Reply Decl. ¶ 3; *see also* Compl. ¶ 104 (referencing lawsuit). A court "may take judicial notice of court filings" in other cases "[t]o determine what issues were actually litigated." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). However, "a court may not take judicial notice of proceedings or records in another [case] so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." *M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983). Thus, the Court will take judicial notice of Exhibit 9 for the existence of the issues litigated in the other action, but not for any other purpose.

## IV. DISCUSSION

Defendant moves to dismiss both Plaintiffs' direct and secondary infringements claims. As to the direct infringement claim, Defendant argues that (1) Plaintiffs fail to sufficiently allege that their films were used to train any of Defendant's AI models, *see* Mot. at 12-13; Reply at 2-4, ECF No. 39; and (2) Plaintiffs fail to plead facts sufficient to show that Defendant was responsible for torrenting Plaintiffs' films, as opposed to individuals accessing the Corporate IP Addresses for personal use, *see* Mot. at 10-11. Defendant also moves to dismiss Plaintiffs' claims for vicarious and contributory copyright infringement on related grounds, as well as on the specific elements of each claim. *Id.* at 15-21. The Court addresses each in turn.

### A. Direct Copyright Infringement

To state a claim for direct copyright infringement, a plaintiff must show (1) ownership of the allegedly infringed material, (2) that an exclusive right granted under 17 U.S.C. § 106 was

United States District Court
Northern District of California

6

violated, and (3) causation by the defendant. *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017). Defendant challenges the second and third elements.

### 1. Violation of an Exclusive Right

Plaintiffs allege that their films were downloaded from and uploaded to peers in the BitTorrent network. Compl. ¶¶ 109-110, 148; Exs. F, H. Defendant does not contest these allegations at this stage. *See* Mot.; *see also* Opp. at 6-7, ECF No. 37. Nor does Defendant dispute that downloading and uploading are infringing acts of reproduction and distribution. *See* 17 U.S.C. § 106; *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) ("Both uploading and downloading copyrighted material are infringing acts."); *see also Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1041 (N.D. Cal. 2025). Thus, Plaintiffs' allegations are sufficient to satisfy the second element of a direct infringement claim.

In Defendant's view, Plaintiffs were required to allege that their films were used to train specific AI models. Mot. at 12-13. Defendant incorrectly extrapolates this pleading requirement from two other cases that involved a different theory of infringement. *See id.* (citing *In re Google Generative AI Copyright Litig.*, 809 F. Supp. 3d 903 (N.D. Cal. 2025) ("*In re Google GenAI*") and *In re Mosaic LLM Litig.*, No. 24-cv-01451-CRB, 2025 WL 2402677 (N.D. Cal. Aug. 19, 2025) ("*In re Mosaic LLM*")); Reply at 2. The plaintiffs in *In re Google GenAI* and *In re Mosaic LLM* were required to allege that their works were used to train defendants' AI models because they claimed that defendants made unauthorized copies "during the model training process." *In re Google GenAI*, 809 F. Supp. 3d at 909; *see also id.* at 914 ("Because Plaintiffs do not allege that any of their works were included in training datasets used to develop these models, Plaintiffs do not plausibly allege copyright infringement."); *In re Mosaic LLM*, 2025 WL 2402677, at *2 ("Plaintiffs do not allege facts that could establish that the DBRX models are actually trained on any shadow library websites, let alone those that contain Plaintiffs' works."). By contrast, in this case Plaintiffs allege that torrenting is the infringing act of reproduction and distribution.[2]

---

[2] Defendant further argues that Plaintiffs did not adequately allege *which* of Defendant's downloads were sped up by seeding Plaintiffs' films on BitTorrent. Mot. at 13. However, Defendant does not provide authority for why this level of detail is required at the motion to dismiss stage. Nor can the Court discern a basis for requiring such particularity given that

7

Because Plaintiffs have adequately pleaded that their exclusive rights under the Copyright Act were violated when their films were torrented, they have satisfied the second element, regardless of whether their films were used to train specific AI models.

### 2. Causation

Defendant next argues that Plaintiffs have failed to allege causation because the complaint does not plausibly show that Defendant – as opposed its many employees, "contractors, visitors, and third parties [who] access the internet at Meta every day" – caused the infringing activity. Mot. at 10 (relying on *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018)). The Court disagrees.

In *Cobbler Nevada*, the Ninth Circuit held that a defendant's "status as the registered subscriber of an infringing IP address" is insufficient "standing alone" to create "a reasonable inference that [the defendant] is also the infringer." 901 F.3d at 1145. "Because multiple devices and individuals may be able to connect via an IP address," the Ninth Circuit concluded that a "plaintiff must allege *something more* to create a reasonable inference that a subscriber is also an infringer." *Id.* (emphasis added) (holding that plaintiff failed to state a claim against the operator of an adult foster care home based solely on the operator's status as the registered subscriber of the infringing IP address).

In applying this standard, courts have looked to whether the circumstances of the infringement, including the content of the downloads, and any inferences drawn therefrom plausibly link the defendant to the infringing activity. *Compare Strike 3 Holdings, LLC v. Doe*, 791 F. Supp. 3d 1102, 1105 (N.D. Cal. 2025) (holding plaintiff adequately alleged that defendant, rather than his wife, was the infringer because BitTorrent was used to download materials related to defendant's career), *and Strike 3 Holdings, LLC v. Andaya*, No. 21-cv-00760-VKD, 2021 WL 5123643, at *4 (N.D. Cal. Nov. 4, 2021) (holding plaintiff adequately alleged that defendant was the infringer based on connections between defendant's social media interests and the content that was torrented), *with Venice PI, LLC v. Huseby*, No. C17-1160 TSZ, 2019 WL 1572894, at *1-2

---

increased download speeds result automatically from seeding content on BitTorrent. Thus, all that matters is whether Plaintiffs sufficiently alleged that Defendant torrented their films.

United States District Court
Northern District of California

(W.D. Wash. Apr. 11, 2019) (holding that prolonged use of an IP address to infringe media was insufficient when defendant was 75 years old, had only basic computer skills, and lived in an apartment complex).

Here, Plaintiffs do not rely solely on Defendant's status as the subscriber to the Corporate IP Addresses. Rather, Plaintiffs' investigation shows seeming coordination across all the identified IP addresses, which Plaintiffs contend must not be coincidence. The Court agrees, finding that the allegations are sufficient to infer a coordinated effort to gather data – whether Plaintiffs' works were specifically targeted, as they allege, or not – which is enough to survive the motion to dismiss.

To begin, Plaintiffs' investigation shows that the IP addresses torrented files with similar file names on the same day, ranging from pornography to cartoons and sitcoms, suggesting that an algorithm downloaded files based on key terms. *See* Ex. B;[3] *see also* Compl. ¶¶ 95, 101-103. For example, IP Ranges A and F torrented the following files on December 15, 2022: "Teen Sex Sessions 2 (2012)," "Teen Titans Go to the Movies (2018)," "Teens Love Tats XXX," "TeensLoveAnal.16.09.30.Amara," "Teenfidelity Pics," "TeensLoveAnal.16.06.10.Casey," "Teenage Mutant Ninja Turtles (1987-1996)," "Teen Mom Girls Night In S02E08," "TeenyTaboo.22.12.07.Kiana," and "TeenageDelinquents.Maryjane." Ex. B at 3, ll. 54-63. On the same day, a Corporate IP Address was used to torrent "TeenCurves.22.12.09.Willow." *Id.* at 3, l. 64. The connection between these files is plain: The word "teen" appears in every file name. Similar patterns are shown repeatedly across the identified IP addresses.[4] It strains credulity to

---

[3] Defendant argues that the Court should disregard Exhibit B because Plaintiffs did not explain their methodology and the exhibit does not include Plaintiffs' films. Mot. at 11; Reply at 10. Arguments concerning Plaintiffs' methodology are premature on a Rule 12(b)(6) motion. And although the Court may also question why Plaintiffs chose not to cross-reference their own films, that choice does not undermine the fact that, as discussed below, the exhibit plausibly shows coordination across the IP addresses.

[4] *See, e.g.*, *id.* at 8, ll. 289-292 (IP Ranges A and F torrenting "Dragon Wars D-War (2007)" and "Dragonball Season 1" and a Corporate IP Address torrenting "Dragon Ball Super Hero" on December 27, 2022); *id.* at 39, ll. 1722-1728 (IP Ranges A and B torrenting multiple files with the word "bang" in the title, including "The Big Bang Theory S05" and "BangBrosClips.23.05.09.Valerica," and Corporate IP Addresses torrenting "BangMyTrannyAss.Gina" and "BangBangShemale.Ariana" on May 9, 2023).

suggest that these correlations are mere coincidence and the product of individual human selections. Instead, the many commonalities across files permit a reasonable inference that the downloads were operated by an algorithm using key terms, which accounts for why pornography was downloaded alongside children's cartoons and sitcoms. The seeming coordination with the Corporate IP Addresses also supports Plaintiffs' allegation that Defendant controlled IP Ranges A-G and the Residential IP Address. *See also* Compl. ¶¶ 118-119; Ex. H (showing that, on five occasions, IP addresses in Ranges A, B, D, and F worked in concert to target a specific site operated by Plaintiffs for distribution on BitTorrent).

Other algorithmically coordinated behavior is apparent, too, from Plaintiffs' investigation. The IP addresses synchronously changed languages, downloaded obscure yet nearly identical files, and downloaded television shows out of order, all of which tend to disprove Defendant's alternative theory that unrelated individuals torrented the files for personal entertainment. For example, an address in IP Range A and a Corporate IP Address torrented files with names in Russian on the same day, when each typically torrented English media. Ex. B at 5, ll. 177-178. Similarly, addresses in IP Ranges A and F torrented "661188.xyz 极品女神童颜巨乳网红" and "661188.xyz 扭动屁股摆弄姿势" on the same day that a Corporate IP Address torrented "661188.xyz 知名百万粉丝网红," again reflecting coordinated changes in language and that obscure yet nearly identical files were torrented at the same time. *Id.* at 44, ll. 1955-1957. On another occasion, IP addresses in Ranges B and F and a Corporate IP Address torrented eight episodes of Ted Lasso out of order. *See id.* at 45, ll. 2016-2023. Even the episodes torrented by the Corporate IP Addresses were non-sequential, indicating that they were not downloaded by an individual for personal consumption. *See id.* at 45, ll. 2017-2020, 2023. Defendant's alternative explanation is that several people must have torrented the show separately. But the odds that multiple people using the Corporate IP Addresses and the IP Ranges coincidentally torrented the same show, rather than simply streaming it, on the exact same day strains belief and is not a proper inference for the Court to draw in favor of the moving party.

Finally, circumstantial facts alleged in the complaint like the public business setting and Defendant's known use of VPCs to torrent training data also support Plaintiffs' claims. Torrenting

pornography in a place of business is unlike torrenting the same media in the privacy of one's home. It is even unlike streaming pornography while at work, since torrenting requires the user to download the media onto a device. *See* Compl. ¶¶ 63-70. Thus, the fact that the Corporate IP Addresses were used to download pornography supports the conclusion that the films were not torrented for personal entertainment, when considering the totality of the circumstances. Additionally, Defendant has acknowledged that it used six VPCs to torrent archives for the purposes of acquiring training data, which supports Plaintiffs' allegation that Defendant used VPCs to torrent additional files, including their films.[5] *See* Dunning Decl., Ex. 7; *cf. Andaya*, 2021 WL 5123643, at *4.

Drawing all reasonable inferences in favor of the non-moving party, as it must, the Court holds that Plaintiffs have therefore sufficiently alleged that Defendant engaged in a coordinated effort to gather data through BitTorrent, including by torrenting Plaintiffs' films. The commonalities across downloads – including the apparent use of key terms, coordinated changes in language, similarity in obscure files, and non-sequential torrenting of television shows – in combination with other circumstantial facts creates a reasonable inference that Defendant, not its employees or visitors, controlled the identified IP addresses and used an algorithm to torrent files for a business purpose.[6] *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108. Thus,

---

[5] Defendant argues that the deposition testimony in *Kadrey* "states that the torrenting activity involving [the six VPC] servers began in 2024, *not* six years earlier, in 2018, as would have to be the case if the six servers actually corresponded to IP Ranges A-F." Mot. at 12. But the testimony is not as ironclad as Defendant suggests. It reads:

> Q: When did Meta's torrenting of Anna's Archive end?
> A: In conversations with Xiaolan, it was somewhere between April and June of 2024. . . .
> Q: So Meta began torrenting in April and completed its torrenting in June?
> A: For the work that Xiaolan was doing, yes.

Dunning Decl., Ex. 7 at 52. Thus, the testimony Defendant cites concerned the work that "Xiaolan was doing" and the "torrenting of Anna's Archive," but does not purport to address when Defendant used the VPCs or BitTorrent in general. *Id.*

[6] Because Plaintiffs' allegations are plausible, many of Defendant's other arguments are premature since the Court may not weigh inferences. *See* Reply at 3 (urging the Court to draw "[t]he far more logical inference"). Specifically, the Court cannot at this time credit Defendant's arguments that: (1) it would not have included adult films in its training data because its AI Terms of Service prohibit using its AI models to generate pornographic content, Mot. at 2; (2) the timing, *i.e.*, when torrenting occurred compared to when Defendant began training video AI models, is

11

Plaintiffs have alleged "something more" than the "bare allegation that [the] defendant is the registered subscriber," which is enough to survive dismissal under *Cobbler Nevada*. 901 F.3d at 1144.

### B.   Vicarious Copyright Infringement

Alternatively, Plaintiffs allege that Defendant is vicariously liable for copyright infringement by its employees. "To prevail on a claim for vicarious infringement, a plaintiff must prove the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Perfect 10, Inc.*, 847 F.3d at 673 (citation modified). Defendant disputes each element.

#### 1.   Control

"[A] defendant exercises control over a direct infringer when [it] has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007). Quintessentially, a defendant can control conduct by its employees that falls within the scope of employment. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261-62 (9th Cir. 1996) ("The concept of vicarious copyright liability was developed . . . as an outgrowth of the agency principles of respondeat superior.").

For the reasons explained above, Plaintiffs' allegations support the inference that Defendant's employees, in the course of their employment, torrented Plaintiffs' films. *See* Compl. ¶¶ 101, 169, 171. Plaintiffs' allegation that the "infringement was authorized, ordered, or performed by [Defendant's] respective officers, agents, employees, representatives, or shareholders" therefore rests on adequate factual foundations. *Id.* ¶ 18; *see also id.* ¶ 165. Accordingly, Plaintiffs have sufficiently alleged control.

---

contradictory, *id.* at 12; (3) certain of Plaintiffs' films were re-downloaded, which does not suggest coordination, *id.* at 13; (4) Plaintiffs failed to explain why Defendant would have secret VPCs yet also torrent materials on its Corporate IP Addresses, *id.* at 14; and (5) "Plaintiffs' hunting-and-pecking allegations . . . stand in stark contrast to *Kadrey* . . . [where] plaintiffs allege[d] that their works were part of immense third-party datasets," *id.* Additionally, the Court observes that the AI Terms of Service address what users *may* do, not what Defendant's AI models *can* do or what training data they ingested. *See* Dunning Decl., Ex. 4.

United States District Court
Northern District of California

## 2.      Financial Interest

The Court next considers whether Plaintiffs have adequately alleged that Defendant derives a financial benefit from the purported infringement.  "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits."  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis omitted); *see also Sid Avery & Assocs., Inc. v. Pixels.com, LLC*, 479 F. Supp. 3d 859, 870 (C.D. Cal. 2020) ("In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one." (quoting S. Rep. No. 105-190, at 44 (1998))).  If infringement creates greater demand for a defendant's goods or services, there is a causal relationship, and the defendant has a financial interest in the infringement.  *See A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1023 (9th Cir. 2001); *see also Fonovisa*, 76 F.3d at 263-64.  Further, the causal relationship may exist when the infringement generates foreseeable financial gain by acting as a draw for customers, even if the revenue comes from the sale of ancillary goods rather than the sale of infringing materials.  *See Fonovisa*, 76 F.3d at 263 (holding that a swap meet operator had a financial interest in vendors selling counterfeit recordings because it "reap[ed] substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow[ed] directly from customers who want[ed] to buy" the recordings).

Plaintiffs' theory is that Defendant torrented their films "for commercial use" to train its AI models because their films "provide unique dialog, sound effects, and non-verbal vocalizations" and "a distinct visual model of human form, motion, and interaction with technically rich diverse video quality."  Compl. ¶¶ 126, 132, 137-139.  Training on Plaintiffs' films allegedly provides "unique advantages" for Defendant's AI models and may enable them to produce films that competitors cannot replicate.  *See id.* ¶¶ 132-145.  These advantages confer a financial benefit because Defendant expects to earn $460 billion to $1.4 trillion in total revenue from AI by 2035.  *Id.* ¶ 126.  Defendant argues that these allegations are deficient because Plaintiffs "make no attempt to tie" the fees Defendant charges for its AI products "to the 'availability of infringing

13

material,'" and that this showing is required.  Reply at 12.

The Court finds the Ninth Circuit's decision in *Napster* instructive in addressing this issue. In *Napster*, the defendant offered software that facilitated the transmission of infringing MP3 files between users.  239 F.3d at 1012.  The Ninth Circuit held that Napster had a financial interest in the infringement because its "future revenue [was] directly dependent upon increases in userbase" and "[m]ore users [would] register with the Napster system as the quality and quantity of available music increase[d]."  *Id.* at 1023 (citation modified); *see also A & M Records, Inc v. Napster, Inc.*, 114 F. Supp. 2d 896, 902 (N.D. Cal. 2000) (finding that "[t]he value of the system grows as the quantity and quality of available music increases" and that Napster employed "a strategy of attaining a 'critical mass' of music in an 'ever-expanding library'").  Like the critical mass strategy employed in *Napster*, training AI models depends on accumulating and ingesting mass amounts of training data to improve the model's quality and functionality.  Thus, the causal relationship between the infringing activity and financial benefit is similar – *i.e.*, users will be drawn to Defendant's AI models by functionality that exists due to the quantity and quality of the training data set.  And although the alleged revenue comes from the sale of AI products, rather than copies of Plaintiffs' films, that is a foreseeable financial benefit from training the models on works that were acquired using BitTorrent.  *See Fonovisa*, 76 F.3d at 263.

In sum, Plaintiffs have alleged that their particular copyrighted works offer specific and unique advantages for training Defendant's AI models.  Accordingly, the Court finds that Plaintiffs have plausibly alleged that Defendant has a financial interest in the purported infringement.[7]  *See Barkley & Assocs., Inc. v. Quizlet, Inc.*, No. 24-cv-05964-WLH-E, 2025 WL 1421844, at *4 (C.D. Cal. Apr. 11, 2025) (finding the financial interest element satisfied when plaintiff alleged that defendant directed third-party AI vendors to use copyrighted materials in

---

[7] Plaintiffs present two other arguments.  First, they argue that Defendant has a direct financial interest because it "received and stockpiled Plaintiffs' creative works without obtaining a license to train its AI."  Opp. at 20.  This argument is unavailing because a vicarious infringer's "avoidance of licensing fees [does] not confer a direct financial benefit . . . as a matter of law."  *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 831 (9th Cir. 2019).  Second, Plaintiffs assert that, by seeding Plaintiffs' films on BitTorrent, Defendant gained efficiencies in the form of faster download speeds and lower labor costs.  Opp. at 20.  The Court does not reach Plaintiffs' second argument.

training models and that defendant benefitted from paid subscriptions that relied on those materials).

### C.   Contributory Copyright Infringement

As another basis for secondary liability, Plaintiffs allege that Defendant is contributorily liable for copyright infringement by its employees.  Contributory liability requires that a party (1) has knowledge of another's infringement and (2) either (a) induces or (b) materially contributes to that infringement.  *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (citation omitted).  Defendant disputes each element.

#### 1.   Knowledge

To establish knowledge, a plaintiff can show either actual knowledge or willful blindness. *See Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013).  "Actual knowledge exists where it can be shown by a defendant's conduct or statements that it actually knew of specific instances of direct infringement."  *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098, 1106 (N.D. Cal 2008).  This standard is met when "more than merely *knowing of* and *contributing to* the infringing activity, [the defendant is] alleged to have specifically *ordered* that such activity take place."  *UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408, 413 (N.D. Cal. 2004).  For the reasons discussed above, Plaintiffs have adequately alleged that Defendant ordered the use of BitTorrent, given the apparent coordination across IP addresses, and therefore possessed actual knowledge.[8]  *See* Compl. ¶¶ 18, 101; Ex. B.

#### 2.   Inducement or Material Contribution

During the pendency of this motion, the Supreme Court clarified that "[t]he provider of a service is contributorily liable for [a] user's infringement only if it intended that the provided service be used for infringement."  *Cox Commc'ns, Inc. v. Sony Music Ent.*, 607 U.S. ----, 146 S. Ct. 959, 967 (2026).[9]  Intent "can be shown only if the party induced the infringement or the

---

[8] Because Plaintiffs have sufficiently alleged actual knowledge, the Court need not reach the parties' arguments concerning willful blindness or whether Plaintiffs put Defendant on notice of the infringement.  *See* Mot. at 18; Opp. at 21-22.

[9] Defendant's administrative motion seeking leave of court to file statement of recent decision, ECF No. 54, concerning *Cox Communications* is GRANTED.

United States District Court
Northern District of California

15

provided service is tailored to that infringement." *Id.* A party induces infringement if it takes "active steps . . . to encourage direct infringement," *VHT, Inc.*, 918 F.3d at 745 (citation modified), and a "service is tailored to infringement if it is not capable of substantial or commercially significant noninfringing uses," *Cox Commc'ns*, 146 S. Ct. at 967 (citation modified).

Standing alone, Plaintiffs' allegation that Defendant "provid[ed] access to its servers, data centers, IP addresses, computers, networks, [and] accounts" would be insufficient under *Cox Communications*. Compl. ¶ 165; *see also Cox Commc'ns*, 607 U.S. at 968 (holding that petitioner was not liable when it "provided Internet service to its subscribers, but . . . did not intend for that service to be used to commit copyright infringement"). However, Plaintiffs plausibly allege that Defendant took active steps to encourage torrenting by implementing an algorithm and establishing VPCs – tools tailored to infringe copyrighted works using BitTorrent. Compl. ¶¶ 101-102; *see also Columbia Pictures*, 710 F.3d at 1032 ("[O]ne who distributes a device with the object of promoting its use to infringe copyright . . . is liable for the resulting acts of infringement[.]" (citation modified)). Thus, Plaintiffs have alleged sufficient facts to show inducement.[10]

## V.    CONCLUSION

In sum, Plaintiffs have plausibly alleged that Defendant is liable for direct, vicarious, and contributory copyright infringement based on the torrenting of their films. Defendant's motion to dismiss is therefore DENIED.

**IT IS SO ORDERED.**

Dated: June 11, 2026

_____
Eumi K. Lee
United States District Judge

---

[10] Because inducement is satisfied, the Court need not address whether Plaintiffs also sufficiently alleged material contribution.

United States District Court
Northern District of California